STATE of Tennessee, Appellee,

v.

Homer B. TEEL, Defendant–Appellant.

Supreme Court of Tennessee,
at Nashville.

May 29, 1990.

Charles W. Burson, Atty. Gen. and Reporter, John Knox Walkup, Sol. Gen., C. Anthony Daughtrey, Asst. Atty. Gen., Nashville, and J. William Pope, Jr., Dist. Atty. Gen., Pikeville, for appellee.

Edwin Z. Kelly, Jr., Jasper and L. Thomas Austin, Dunlap, for defendant-appellant.

## OPINION

DROWOTA, Chief Justice.

The Defendant, Homer "Butch" Teel, appeals directly to this Court his conviction of first degree murder and the sentence of death imposed by the jury. He raises numerous issues in this appeal, including: the trial court's failure to suppress statements made by the Defendant to detectives and to various jailhouse inmates while in custody, the court's failure to exclude testimony of the State serologist, the court's failure to exclude evidence relative to the condition of the decedent's body as found, errors alleging prosecutorial misconduct, errors relating to the denial of continuances and change of venue and the sufficiency of the evidence to support the conviction and the sentence. After a careful review of the entire record and the law, we find these issues to be without merit. We, therefore, affirm the conviction and the sentence.

The events leading up to the murder and disappearance of 14–year–old Tara Stowe and the subsequent arrest of the Defendant Teel will be described in detail in order to give meaning to the sixteen issues which we will consider on appeal. The Defendant was convicted of the murder of Tara Stowe in Marion County on the night of November 29, 1986. Tara lived with her grandmother in Tiftonia, Tennessee. Her grandmother had gone to Dallas, Texas, for several days and Tara was staying with her aunt, Betty Davis. On Saturday evening, November 29, at approximately 8:00 p.m., Betty Davis left her mobile home in Tiftonia to pick up her mother, Tara's grandmother, in Chattanooga. Tara and Betty's daughter, Kerry, were left at the mobile home with some of their friends, John Dagnun, David Dagnun and Tony Dagnun. Tara spoke on the telephone with the Defendant who was an acquaintance of hers. Later that evening Tara rode with her friends, John, David and Tony, in the back of a pickup truck driven by John's father to the Egypt Hollow community of Marion County, where the Dagnuns lived. She was let out about 10:00 p.m. near the trailer where "Butch" Teel lived with his grandmother.

The Defendant, "Butch" Teel, who was raised by his grandmother, was 20-years-old. He did not know his father, and his mother had died six years before the events in this case occurred. He had spent his entire life in the Egypt Hollow area and attended school up to the ninth grade. About the time that Tara arrived in Egypt Hollow on November 29, Tim Sexton and the Defendant were driving to Betty Davis's mobile home. On the way there, Sexton was told by the Defendant that their friend, James Dagnun, was living in the woods in a tent in Egypt Hollow, because John Dagnun, Sr. had taken out a warrant charging James with whipping little David Dagnun. James Dagnun, cousin of John Dagnun, Jr., and David Dagnun, was Tara Stowe's boyfriend. Upon arriving at Betty Davis's, the Defendant asked for Tara and was told that she had gone with the Dagnuns to Egypt Hollow. The two then drove back to Egypt Hollow, where they found Tara sitting on the steps of a church. When Tara advised them that she was waiting for her boyfriend, James Dagnun, the Defendant said that he would take her to the place where James was hiding to avoid arrest. Sexton drove up Murphy Hollow Road and left the Defendant and Tara at a large rock beside the road around 10:35—10:40 p.m. Central Standard Time. When the Defendant said that he and Tara were going up on the mountainside to find James Dagnun, Sexton asked if he could go with them. The Defendant refused and told him that James wanted him to bring only Tara. Sexton then left.

On the evening of November 29, both Betty Davis and Tim Sexton saw James Dagnun's high school class ring on Tara's hand. On the days immediately after Tara's disappearance, "Butch" Teel was seen wearing the ring Dagnun had given to Tara. On Sunday, November 30, the Defendant told John Dagnun he had not seen Tara; and on the following Wednesday, he threatened John because he had seen John searching for Tara. The Defendant also asked John if he thought he had "hurt" Tara. On Thursday, Teel told Sexton he had gotten the ring from Tara the night of November 29 and, the last time he saw Tara, she was leaving Egypt Hollow walking toward the interstate. Ronnie Nunley testified that he was 23-years-old and acquainted with the Defendant and that, sometime after Tara was reported missing, the Defendant had told him who she was and had asked him if he wanted a "bone from Tara."

Detective Bill Schroeder of the Marion County Sheriff's Department began investigating the disappearance of Tara Stowe on December 4, 1986. He went to the Teel residence and while talking with Teel, noticed a class ring on his hand. The detective asked Teel to go with him to the Sheriff's office and the Defendant agreed. The Defendant told Schroeder that Tim Sexton had left him and Tara in the hollow and he last saw Tara walking towards the interstate. The Defendant claimed that Tara had given him the class ring. When Detective Schroeder arrested the Defendant, he became irate and said that Schroeder "would never find anything or prove anything on him." The Defendant made several statements about how to get rid of a human body and suggested several locations where authorities might search. These sites were several miles from where Tara's body was eventually found. On December 6, the Defendant told Detective Schroeder that on the night she disappeared Tara had left the hollow with James Dagnun to get beer and that James had given him the ring.

On December 27, 1986, after an exhaustive search, the badly decomposed body of Tara Stowe was found lying in a ravine alongside a creek approximately 65 feet from the guard rail on Murphy Hollow Road. The body was located 248 feet from Egypt Hollow Road and approximately 3500 feet from the point where Sexton last saw Tara alive. Expert testimony indicated the body had probably been dragged into the ravine by animals. Some 36 feet away, investigators found a dark, wet, stained depression where, in the opinion of forensic anthropologist Dr. William M. Bass, the body had originally lain. Tree limbs over the depression indicated an at-

tempt had been made to cover the body. Six to eight feet away, authorities found Tara's slacks and underpants. Certain items of her jewelry were lying in the depression.

The body was face down with the jacket, bra and blouse pulled over her head in a manner inconsistent with animal activity. Hair was stuck to the fingers of her left hand. An autopsy by Dr. Frank King, the Marion County Medical Examiner, and an examination of the bones of the throat, particularly the hyoid bone, by Dr. Bass indicated that the victim suffered trauma to her neck at the time of death. Dr. King testified that the cause of death had been "neck trauma," consistent with one of the following: manual strangulation, ligature strangulation, a blow to the neck, or a cut to the neck that was not deep enough to reach the underlying bones. From the condition of the body, Dr. King could make no conclusion whether the victim had engaged in sexual intercourse near the time of her death. A forensic serologist, however, found spermatozoa consistent with human spermatozoa on a sample taken from the crotch of the victim's underpants.

When Detective Schroeder informed Teel that the body had been discovered and photographed, the Defendant responded, "Good, give me some for my scrapbook." When the Defendant was being booked upon the murder charge, he asked Schroeder about the strength of the case. The Defendant said that he had an "ace in the hole" and "no one else was in it with me." Later, Teel called Schroeder to his cell and asked him about the elements of the degrees of murder and whether it was first degree murder if you killed a person by accident.

The State introduced several inmates from the Marion County and Franklin County Jails who testified that the Defendant had either admitted the killing or made incriminating statements to them. The first, Pandora Edwards, testified that, while she was in a cell next to Defendant's in the Franklin County Jail, the Defendant told her about "some fourteen [year-old] that he had raped, beat up, and cut and buried." Defendant said this had occurred at night and he was unable to sleep because he kept seeing the victim. Edwards' cellmate, Eddie Mae Tate Wilkerson, testified the Defendant said he had killed and buried the girl because she was his girlfriend and she was seeing another man. Inmate Charlie Algood testified that he overheard Defendant tell another inmate that he committed the crime but that they didn't have any witnesses. James Graham testified that Defendant told him that a girl was missing and that he would be charged with murder if she had been killed. Defendant said that the authorities had not found anything yet and that they probably would not. Defendant also admitted the killing to Stephen Morgan. While watching televised news reports of the search for Tara with the Defendant, Morgan and another inmate, George Caldwell, heard the Defendant say, "You're a long ways away from finding the body," and make other similar remarks. The Defendant also told Caldwell that the body was 300 feet from the road. As stated earlier, when found, the body was 248 feet from Egypt Hollow Road.

The most damaging testimony was that of Ernest Morrison, himself a capital defendant from Georgia who had temporarily shared a cell with Defendant and Earl David Crawford at the Marion County jail. Morrison testified that he and the Defendant talked about the murders with which they were charged. The Defendant told Morrison that he had met "the girl" close to a church and had asked her to go somewhere with him. The two had ridden with a third person "so far down the road" when Defendant asked to be let out and told the driver to go on. After the Defendant and the victim walked up the hill, Defendant made her perform fellatio on him. The two then walked through the woods, and the Defendant removed the victim's pants and panties and had sexual intercourse with her. All of this time, the victim was pleading with him not to hurt her. After this, the Defendant grabbed the victim by her hair and told her, "[W]ell, you know, it's you~ time.... I can't, you know, stand no more of it." He then walked her down to

the creek where he forced her to kneel and perform fellatio again. After this, he pushed her to the ground, forced her head into the creek and drowned her. He then took her ring, dragged her up the hill, laid her body in the brush, and covered her up, according to his account, not caring whether she was buried.

The defense presented the testimony of the Defendant's grandmother and of Shirley and Darrell Williams, who lived in the grandmother's trailer. They said that on the night of November 29, Tara Stowe had come to the trailer and left when she learned that the Defendant was not there. The Defendant himself had come home later sometime between 11:00 and 11:30 p.m. Eastern Standard Time and had remained there the rest of the night. Darrell Williams testified that he had seen James Dagnun in "the hollow" on November 29. He also had seen Dagnun riding in his father's car "sort of like he was trying to avoid being seen" during the time of the search and later, after the body had been found, cleaning trash and clothes out of his car at his grandmother's house.

James Lewis, cellmate of inmates Stephen Morgan and James Graham, testified he heard the two planning to make up testimony against the Defendant in order to get probation. Earl David Crawford, Morrison's cellmate, testified that Morrison and the Defendant did not get along and that he had never heard any conversation between them in which the Defendant told Morrison about the murder.

The Defendant testified that he had been with James Dagnun at Paralee's, a local hangout in Egypt Hollow, on November 29. Both he and James had talked with Tara on the telephone at that time. Later, the Defendant and Tim Sexton went to the Betty Davis residence and asked for Tara. They later went to Egypt Hollow, where they saw Tara sitting on the steps of a church. The three then drove up into the hollow, stopped and got out of the car. The Defendant said that after Tim left, James arrived. James and Tara began to argue because James's mother wanted him to get his ring back from Tara. James took the ring off Tara's hand and gave it to the Defendant to keep for a couple of days. The Defendant last saw Tara and James Dagnun arguing as they "left back out towards the hollow" in the direction of the interstate. The Defendant then went home.

In rebuttal, the State presented the testimony of John Dagnun and Tim Sexton that Darrell Williams had told them that the Defendant had not come home until six o'clock the morning after November 29. Jan Gifford, a friend of James Dagnun's mother, testified that James Dagnun had been at her house at Trenton, Georgia, from 7:00 p.m. November 29, until 2:00 p.m. the next day. Gifford's testimony, as well as that of several other witnesses, clarified that James Dagnun did not testify at trial because at that time he was hospitalized at a burn center in Augusta, Georgia.

Neither the State nor the Defendant presented any additional proof at the sentencing hearing.

I

■ Defendant contends in his first issue that the trial court erred in overruling his motion to suppress certain statements made to Detective Schroeder and to fellow inmates while he was in custody and that the trial court erred in failing to grant his application for interlocutory appeal of the court's order overruling his motion to suppress. We are of the opinion that the statements made to Detective Schroeder and to fellow prisoners were properly admitted.

The Defendant argues that the statements should be suppressed because they were the result of an illegal arrest and were made in violation of his rights under the Fourth, Fifth, and Sixth Amendments. The substance of Defendant's argument is that his statements should not be admitted because he was held for almost three weeks under the "pretense" of two other outstanding charges and the other inmates were acting as agents of the State when they heard his comments. It was revealed during the suppression hearing that, after

learning that the Defendant was the last person seen with Tara Stowe and that he had also been seen wearing her ring, Detective Schroeder went to the Defendant's trailer on the evening of December 4, 1986. Schroeder met with the Defendant and, after telling him why he was there and ascertaining that he was wearing the victim's ring, advised the Defendant of his *Miranda* rights. When the Defendant asked if he was under arrest, Schroeder said no, but that it was possible that he might be placed under arrest later. The Defendant then consented to go to the station and remarked that he had nothing to worry about.

Once at the jail, Schroeder again advised Defendant of his rights. The Defendant then told Schroeder about how he and Sexton had picked up Tara and how, after giving him the ring, she had walked away down the road. Schroeder testified that the Defendant was free to leave the station at the time this first statement was made. After speaking with Sexton and his parents around midnight, however, Schroeder informed the Defendant that, based upon Defendant's and Sexton's statements, he was going to charge him with contributing to the delinquency of a minor, a misdemeanor under T.C.A. § 37–1–156. Thereupon, on December 5, 1986, at approximately 2:00 a.m., the Defendant was arrested on a juvenile warrant on those charges and held in the Marion County jail.

Around 9:00 a.m. that same morning, Georgia officers informed Schroeder that the Defendant had been charged with aggravated assault in Dade County, Georgia, and that his bond there had been revoked. The Georgia authorities requested a hold be put on the Defendant. At 11:00 a.m., after speaking with his family and after again being given his rights, Defendant gave Detective Schroeder a written statement. Subsequently, while being held at the jail, the Defendant made additional statements on December 6, 15, and 18, 1986. Detective Schroeder testified that he had advised Defendant of his rights each time that he spoke with him except on those occasions when the Defendant flagged him down as he walked through

the jail and initiated a general conversation.

On December 23, 1986, the contributing charge was dismissed in Juvenile Court at Schroeder's request. On December 27, 1986, Defendant was charged with first degree murder, and counsel was appointed on December 29. The statements given during his booking on December 27 were extemporaneously initiated by the Defendant as were the questions he asked about the charges and the case on January 11, 1987. Defendant was indicted on February 2, 1987.

Detective Schroeder also testified that he had never asked or directed any inmates to question the Defendant; that the other prisoners at the jail would simply tell him about Defendant's statements. The only other witnesses at the suppression hearing were the Defendant's grandmother, who testified about the night he was picked up at the trailer, and Assistant District Attorney Mike Caputo, who testified primarily about the circumstances of a statement that was not used at trial.

■ Regarding the Defendant's first statement on the evening of December 4, regardless of whether the Defendant was in custody, the proof is clear that Defendant voluntarily waived his Fifth Amendment rights after they were given. Since the case was only under investigation and no adversary proceedings had begun, his Sixth Amendment right to counsel was also not violated. *See State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn.1980).

■ As to the written statement given on the morning of December 5, the Defendant, who was in custody, was once more given his *Miranda* rights and waived them. Adversary proceedings had still not been initiated. That Defendant was being held on other charges did not require the suppression of these statements, in this case, on Sixth Amendment grounds. *See Maine v. Moulton*, 474 U.S. 159, 106 S.Ct. 477, 489, 88 L.Ed.2d 481 (1985).

■ The Defendant complains that he was interrogated by his fellow prisoners at

the insistence of police officers. There was no proof at the suppression hearing that any of the inmates were acting as agents for the State or that the State deliberately induced, enticed, or prompted these communications so as to require their suppression. *See Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 2630, 91 L.Ed.2d 364 (1986); *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

■ As the final part of this issue, Defendant argues that the trial court erred in denying his application for interlocutory appeal of the denial of his motion to suppress. Defendant claims that he was effectively deprived of his Fifth Amendment rights under the United States Constitution because he was left with no choice regarding whether to take the witness stand. It is clear that the denial of an interlocutory appeal did not irreparably injure any of Defendant's rights and that all issues that could have been raised on interlocutory appeal have been preserved for review on this appeal. *See State v. Martin*, 634 S.W.2d 639, 643 (Tenn.Crim.App.1982); *State v. Hartsfield*, 629 S.W.2d 907 (Tenn.Crim. App.1980); *State v. Gawlas*, 614 S.W.2d 74 (Tenn.Crim.App.1980). There is no merit to this argument and Defendant's first issue is denied.

## II

■ Defendant next insists that the trial court erred in refusing to grant his motions to continue or to exclude the testimony of Ernest Morrison or Jan Gifford.

### (a)

Defense counsel filed its first motion for continuance on August 12, 1987, on the grounds that the State had not properly complied with discovery motions and had furnished the requested information on July 31, 1987, only one month before trial. The witness list contained the names of twenty one potential witnesses spread throughout Marion, Hamilton, Franklin and Knox Counties in Tennessee and one witness, Ernest Morrison, who was located in Augusta, Georgia. The motion was heard on August 12 and overruled "subject to

you having an adequate opportunity to get in touch with these people." On August 31, the first day of trial, defense counsel renewed their motion to continue, but at that time the motion was directed primarily toward the alleged inability of the defense to learn Ernest Morrison's complete criminal record and not toward any difficulty in locating and investigating the other witnesses. This motion was denied. The Defendant does not allege that counsel never interviewed the witnesses in advance nor does he state how many of the witnesses were unknown before disclosure.

We have held that the grant or denial of a request for continuance rests within the sound discretion of the trial judge and will not be disturbed unless the requesting party makes a clear showing of prejudice. *Moorehead v. State*, 219 Tenn. 271, 409 S.W.2d 357, 358 (Tenn.1966); *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn.Crim. App.1982). Defendant has not made the clear showing of prejudice necessary for reversal under the record in this case.

### (b)

■ During the trial, defense counsel made oral motions to exclude the testimony of Ernest Morrison and that of Jan Gifford, a rebuttal witness called by the State at the end of the trial proceedings. Defense counsel argued during these oral objections and motions that allowing these witnesses to testify was prejudicial to the Defendant because it prevented his adequately preparing his defense regarding these witnesses and rendered his cross-examination of these witnesses essentially worthless.

Defendant avers the defense had little opportunity to investigate Morrison's background, primarily his criminal convictions. Morrison was one of the twenty-one witnesses whose existence the Defendant learned about on July 31, one month before trial. The record shows that defense counsel conferred with Morrison before trial and also that a copy of his convictions was given to Defendant before trial. Morrison admitted to the murder, armed robbery and rape charges which were pending in a capital case in Georgia. Defendant fails to

explain how Morrison could have been impeached with greater effect. The Defendant also presented the testimony of Earl David Crawford to impeach Morrison. No prejudice has been shown entitling the Defendant to relief. *Cf. State v. Garland,* 617 S.W.2d 176, 185 (Tenn.Crim.App.1981).

The Defendant argues that the "surprise" testimony of Jan Gifford on the last day of trial, creating an alibi for James Dagnun was highly prejudicial. The Defendant attempted to shift the blame to Dagnun by testifying that Tara was last seen with James. Jan Gifford rebutted this by establishing that James was at her home in Trenton, Georgia, at that time. The State submitted at trial that the issue was raised by the Defendant's testimony. The witness explained that she received her subpoena for trial on the day of her testimony and that no officer discussed the case with her before that date.

A request for discovery of names of witnesses does not include the State's rebuttal witnesses. *See* Raybin, 9 *Tennessee Criminal Practice and Procedure,* § 13.16 (1984). A contrary rule would require the State to anticipate every possible issue the defense might raise. Since the testimony was proper rebuttal to an issue raised by the Defendant's testimony, the State had no duty to disclose the witness's name in advance.

The Defendant makes no showing of how Jan Gifford's testimony or cross-examination might have been different if he had known she would testify. In addition, the Defendant has failed to establish any prejudice requiring reversal.

### III

Defendant alleges in his third issue that the trial court erred in failing to grant his motion for a change of venue. Defendant filed a pre-trial motion for change of venue and the trial court took the motion under advisement pending a completion of *voir dire.* At the beginning of trial defense counsel supplemented the motion by filing an affidavit and various newspaper clippings. After completion of jury selection the Defendant did not renew his motion for change of venue.

Venue may be changed where it appears to the court that due to undue excitement against the defendant in the county where the offense was committed, or for any other cause, a fair trial could not be had. Tenn.R.Crim.P. 21(a). The matter of change of venue is addressed to the sound discretion of the trial court, whose decision will not be reversed absent an affirmative and clear abuse of discretion. *State v. Melson,* 638 S.W.2d 342, 360 (Tenn. 1982); *State v. Hoover,* 594 S.W.2d 743 (Tenn.Crim.App.1979). Our examination of the newspaper articles and a reading of the *voir dire* shows no abuse of discretion.

### IV

Defendant avers that the jury selection procedures deprived him of an impartial jury. He contends that the process of "death qualifying" prospective jurors permitted by the trial court produced a jury biased in favor of the State on the issue of guilt or innocence, and one not fairly representative of the community, in violation of the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 6, 8 and 9, of the Tennessee Constitution. This argument has been rejected by both the Tennessee and United States Supreme Courts. See *State v. Wright,* 756 S.W.2d 669 (Tenn.1988); *State v. Coker,* 746 S.W.2d 167, 171 (Tenn.1987); *State v. McKay,* 680 S.W.2d 447, 450, 453– 55 (Tenn.1984); *State v. Melson,* 638 S.W.2d 342, 362 (Tenn.1982); *Houston v. State,* 593 S.W.2d 267 (Tenn.1980); and *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

As a part of this argument Defendant also specifically challenges the exclusion of prospective jurors Wilkins, Ivey, Hicks and Cartwright because of their views on the death penalty. In *Wainwright v. Witt,* 469 U.S. 412, 423, 105 S.Ct. 844, 851–852, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that a trial court may constitutionally exclude from capital sentencing juries those jurors who are unwilling or unable to obey the

law or to follow their oath. We have examined the record and find that the responses of the excused prospective jurors supports the trial court's decision to exclude them.

## V

■ Defendant contends that the trial court erred during *voir dire* in refusing to excuse prospective jurors Trantham and Soileau for cause and in excusing prospective jurors Hicks and Cartwright for cause.

We have read the *voir dire* examination of Trantham and Soileau and find no error in the court's refusal to excuse them for cause. Furthermore, even if there had been error as to one of them, Defendant failed to exhaust his peremptory challenges, having reserved one of the fifteen. Since he was not forced to accept an incompetent juror and did not exhaust his peremptory challenges, he is not entitled to relief. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *State v. Thompson,* 768 S.W.2d 239, 246 (Tenn. 1989).

Our examination of the *voir dire* of prospective jurors Hicks and Cartwright reveals no error under *Wainwright v. Witt,* 105 S.Ct. at 852, in their excusal.

## VI

■ Defendant avers that the trial court erred in failing to exclude the testimony of the State's serologist. He contends her testimony that spermatozoa consistent with human spermatozoa were found on a sample from the victim's underpants was irrelevant to the charge of first degree murder absent an indictment for first degree murder in the perpetration of rape. Rape, Defendant argues, was not a material proposition during the guilt phase of this trial. Even if relevant, Defendant avers, the prejudicial effect of the testimony outweighed its probative value.

■ We find no merit to either argument. First, although an indictment charges murder in the common law form and does not specifically mention that the killing was committed in the perpetration of, or attempt to perpetrate, one of the felonies named in the first degree murder statute, the charge may be proven with evidence that the killing was committed in perpetration of, or attempt to perpetrate, one of these felonies. *State v. Johnson,* 661 S.W.2d 854, 860–861 (Tenn.1983). Evidence tending to show rape was thus relevant. Second, despite the inability of the pathologist to say that a rape had occurred because of the condition of the body and the inability of the serologist to determine how old the spermatozoa were, the probative value of this evidence, which supported Defendant's admissions he had raped the victim, was not outweighed by its prejudicial effect. *See State v. Banks,* 564 S.W.2d 947, 951–953 (Tenn.1978).

## VII

■ Defendant alleges that the trial court erred in overruling his request for a DNA test. The Defendant sought an examination of the spermatozoa found on the victim's clothing for a DNA comparison with that of the Defendant. Defendant's request was first made at the hearing on the motion for a new trial at which time the oral request was denied. Defendant has not attempted to explain why this request was not made before trial or to present any evidence suggesting that a DNA test would produce admissible evidence. We find no merit to this issue.

## VIII

■ In Defendant's next issue, he avers the trial court erred in admitting evidence relative to the condition of the decedent's body as found and particularly as to anything that occurred to the body subsequent to death. The Defendant says that evidence that the body had decomposed and had been disturbed by animals was irrelevant and, if relevant, that its probative value is outweighed by its prejudicial effect under *State v. Banks,* 564 S.W.2d at 951–953.

Testimony on these matters was relevant to explain, among other things, how the body had been moved from its original location, why there was no physical evidence of rape and why the exact cause of death

could not be determined. It also indicated the length of time the victim had been dead. The testimony regarding these facts was restrained and in no way unnecessarily lurid or gruesome. No photographs of the body were shown to the jury. The trial judge did not err in admitting the testimony of Dr. Bass.

## IX

Defendant next objects to as irrelevant Detective Schroeder's testimony at the guilt hearing that Defendant had told him that one way to get rid of a body was to feed it to pigs and that he wanted pictures of the body for his scrapbook. He also objects to admission of his statements about putting a body in a graveyard and the various places where authorities should search for bodies on the mountain. All of these statements are relevant to show malice and those concerning the location of the body evince a desire to mislead the authorities and to evade prosecution from which guilt may be inferred. *See Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451, 459 (1958). The most questionable statement is that about the photographs for the Defendant's scrapbook, but any error here is clearly harmless in light of the proof. *State v. Banks*, 564 S.W.2d at 951–953.

## X

Defendant avers that the trial court erred in failing to suppress statements made by Defendant to various jailhouse inmates. Defendant argues that the authorities violated his Sixth Amendment rights by using inmates to "interrogate" him. This argument has already been discussed in Issue I. As further grounds for suppression, Defendant, at a jury out hearing at trial, presented the testimony of three prisoners—Scholtz, Freeman and Green—who had been incarcerated with him after his indictment, to the effect that Detective Schroeder had asked Scholtz to wear a bug in the cell with Defendant and had inquired if these prisoners "knew anything on" the Defendant. Schroeder testified that their testimony about the bug was false but that Scholtz on his own had vol-unteered to wear a bug. Schroeder reiterated that he had never asked any prisoner to elicit information from the Defendant. The trial court found that there had been no effort by the Sheriff's Department to solicit the information and that the Department had simply "availed" itself of listening to what the inmates had heard the Defendant say; therefore, there was no constitutional violation. The evidence does not preponderate against the finding of the trial court. *See State v. O'Guinn*, 709 S.W.2d 561, 565 (Tenn.1986).

## XI

The Defendant complains of the State's examination of Pandora Edwards during which the Attorney General unsuccessfully tried to elicit testimony that the Defendant had said the victim was "a whore" and "deserved it." Despite the prosecution's questions, Edwards persisted in testifying that the Defendant had said nothing good or bad about the victim. Defendant objected to this line of questioning, and after a jury-out hearing, the trial court sustained the objection and gave curative instructions to the effect that the prosecutor's questions had been improper and should not be considered. We find the prosecutor's questions improper; however, we find his actions harmless beyond a reasonable doubt. *State v. Payne*, 791 S.W.2d 10 (Tenn.1990).

## XII

Defendant next argues that prejudicial prosecutorial misconduct occurred during the State's cross-examination of the Defendant when the Attorney General attempted to dramatize areas of conflict in the testimony of the Defendant and other witnesses. The trial judge sustained Defendant's objections and at one point gave the jury a curative and explanatory instruction on the unfairness of "blanket" type questions. Defendant requested no mistrial. There was no reversible error.

Finally, the Defendant complains about the State's argument at the sentencing hearing that the victim had begged for her life. In *State v. Beasley*, 536 S.W.2d

328 (Tenn.1976), we held that a prosecutor's argument must be supported by evidence introduced at trial and the reasonable inferences to be drawn from that evidence. Contrary to Defendant's assertion that there was no proof that the victim had begged for her life, the testimony of Ernest Morrison that the victim pleaded with Defendant fully supports this argument. *Id.* at 330, *State v. West,* 767 S.W.2d 387, 394 (1989).

### XIII

■■■■ The Defendant contends that the instructions at the guilt phase were erroneous. He challenges the instruction on first degree murder because it included a partial definition of felony murder, i.e., the instruction tracked the statutory language of T.C.A. § 39-2-202(a), but did not define for the jury the felony upon which a first degree murder conviction could be based, here rape. It is clear there was no error in instructing the jury on felony murder under the indictment although separate counts on that charge would have been preferable. *See State v. Barnes,* 703 S.W.2d 611, 615 (Tenn.1985). It is erroneous, however, for the trial court in such cases to omit a definition of the felony alleged to support first degree murder. The words defining the offense of first degree murder have a technical meaning and it is the trial court's duty to give such meaning to the jury in the charge and not merely to use the language of the statute. *Poole v. State,* 61 Tenn. 288, 293–294 (1872); *see also* T.P.I. Crim. 20.02. Rape as a basis for a first degree murder conviction was a theory presented to the jury in this case.

■■■■ While the Defendant did object to charging felony murder under the indictment and raised this as an issue on his motion for a new trial, he did not specifically object to the omission of the definition of rape in the charge or request additional instructions on this point. When told by the trial judge before the charge, that the court intended only to instruct the first degree murder statute, Defendant made no objection. While there is authority that

mere meagerness of the charge under such circumstances is not reversible error in the absence for a request for an additional charge, *see State v. Haynes,* 720 S.W.2d 76, 85 (Tenn.Crim.App.1986), a defendant has a constitutional right to a correct and complete charge of the law. *State v. Staggs,* 554 S.W.2d 620, 626 (Tenn.1977); *State v. Lee,* 618 S.W.2d 320, 323 (Tenn.Crim.App. 1981). The charge here omitted is one that is fundamental in nature, essential to a fair trial, so that the failure to request that rape be defined does not preclude a finding of error. *See State v. Martin,* 702 S.W.2d 560, 563–564 (Tenn.1985); *Pope v. State,* 212 Tenn. 413, 370 S.W.2d 488, 489 (1963). It is the duty of the trial judge without request to give the jury proper instructions as to the law governing the issues raised by the nature of the proceedings and the evidence introduced during trial, and simply reading a statute to the jury when the statute contains words requiring clarification does not satisfy "the demands of justice" or the defendant's constitutional right to trial by jury. *State v. McAfee,* 737 S.W.2d 304, 308 (Tenn.Crim.App.1987).

■■■■ The law is unsettled as to whether harmless error analysis is available when a trial court fails to instruct on an essential element of an offense. *See, e.g., Polsky v. Patton,* 890 F.2d 647, 651 (3d Cir.1989); *Hoover v. Garfield Heights Municipal Court,* 802 F.2d 168, 175–178 (6th Cir.1986), *cert. denied* 480 U.S. 949, 107 S.Ct. 1610, 94 L.Ed.2d 796 (1987). Harmless error analysis has been applied, however, where the trial court has failed to define a separate felony which is an essential element of the felony with which a defendant is charged. For example, in *State v. Lee,* 618 S.W.2d at 323, the court held that the trial court's failure to define "murder" in a case involving a charge of solicitation to commit first degree murder was error harmless beyond a reasonable doubt. In *Bell v. Watkins,* 692 F.2d 999, 1005–1006 (5th Cir. 1982) *cert. denied* 464 U.S. 843, 104 S.Ct. 142, 78 L.Ed.2d 134 (1983), the Fifth Circuit held that the trial court's failure to define the felonies of kidnapping and armed robbery underlying a charge of capital murder

was harmless error under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In most cases where the courts have rejected a harmless error analysis, the omission from the instruction, unlike that in the present case, prevented the jury from considering a material issue so that the trial court's failure to instruct was the equivalent of a directed verdict. *See Hoover v. Garfield Heights Municipal Court,* 802 F.2d at 177.

In the present case the jury returned a verdict that the Defendant was "guilty of murder in the first degree." The jury was completely and correctly instructed as to the elements of first degree, common-law, premeditated murder, and the evidence is clearly sufficient to support a conviction on this charge. Also, at the sentencing phase, without the presentation of any evidence additional to that presented at the guilt phase, the same jury was fully instructed on the elements of rape in connection with aggravating circumstance (i)(7) and in its sentencing decision, only a short time after its decision as to guilt, expressly found beyond a reasonable doubt that the murder had been committed in the perpetration of rape. *Cf. State v. Carter,* 714 S.W.2d 241, 250 (Tenn.1986). For these reasons, we are of the opinion that the omission of the definition of rape in the first degree murder charge, in the unique circumstances and total context of this case, is harmless error beyond a reasonable doubt.

◼ Finally, the Defendant complains that a portion of the malice instructions created a presumption of malice in violation of *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The malice instruction in this case speaks only of an inference of malice. It neither presumes malice nor requires the inference to be drawn. There is no *Sandstrom* error. *See State v. Martin,* 702 S.W.2d 560; *State v. Bolin,* 678 S.W.2d 40, 44–45 (Tenn.1984).

1. T.C.A. § 39–2–203(i)(5) sets forth the aggravating circumstance that the "murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Section 39–2–203(i)(7) states the aggravating circumstance that the murder was committed while the

**XIV**

◼ Defendant's next issue is whether the aggravating circumstance found by the jury is proper and supported by the evidence. The jury was instructed as to two statutory aggravating circumstances, T.C.A. § 39–2–203(i)(5) and (7).[1] The verdict form used in this case specified that "the jury must verbatim write and specifically list below ... the particular statutory circumstance or circumstances found by the jury," and the charge included the instruction that "the jury must include and reduce to writing the specific aggravating circumstance or circumstances so found." Nevertheless, the jury returned as its aggravating circumstance the following: "The murder was especially heinous, atrocious in that it involved depravity of mind while the Defendant was engaged in committing rape." This was a finding not in strict compliance with the instructions. However, the statute makes no requirement of a verbatim statement of the aggravating circumstances. *See* T.C.A. § 39–2–203(g). The finding of the jury is sufficient to comply with the statute in that the aggravating circumstances found are clearly those allowed by the statute and permit effective appellate review of the sentence. *Cf. State v. Henley,* 774 S.W.2d 908, 917 (Tenn.1989).

◼ Defendant argues that the aggravating circumstance in (i)(7) was not supported by the proof because the jury's finding of rape was not supported by the evidence. There is no merit to this argument. The Defendant's confession of rape to two fellow prisoners corroborated by the presence of human spermatozoa on the victim's clothing, the location of her pants and underpants away from the body, and the positioning of her jacket and brassiere over her neck and head, is sufficient to support the finding that the murder occurred during the commission of a rape.

defendant was "engaged in committing, or was an accomplice in the commission of, or was attempting to commit, or was fleeing after committing or attempting to commit" certain listed felonies, in this case rape.

## XV

The Defendant avers that the evidence was not sufficient to support the conviction and the sentence. Where the sufficiency of evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Findings of guilt shall be set aside only if the evidence is insufficient to support this finding. T.R.A.P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983). On appeal the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832 (Tenn. 1978).

### A

We are of the opinion that the evidence is sufficient to support a finding that the Defendant was guilty of first degree murder. The proof established that the Defendant was the last person seen with Tara Stowe on the night she disappeared and that he was seen shortly thereafter wearing a class ring which had been in her possession. He lured her into a secluded area on the pretense that her boyfriend was waiting there for her. When Tim Sexton drove the Defendant and Tara up Murphy Hollow Road and asked to go with them, the Defendant refused. Tara's boyfriend, James Dagnun, was actually in Trenton, Georgia, at that time.

Before he was arrested, the Defendant made statements to acquaintances which incriminated him. Four days after the disappearance, he asked John Dagnun if he thought the Defendant had hurt Tara. He told Tim Sexton that Tara had given him the ring which she was wearing the night she disappeared. He asked Ronnie Nunley if he wanted a "bone from Tara". The Defendant admitted raping Tara to two fellow prisoners. Several others overheard the Defendant admit to the murder.

### B

Regarding sentencing, the Defendant challenges the sufficiency of the evidence to support a finding of depravity necessary to support aggravating circumstance (i)(5). The proof here amply supports a finding of depravity. *Cf. State v. Cooper*, 718 S.W.2d 256, 259–260 (Tenn. 1986) (defendant's feelings of fright and helplessness supported finding of torture and depravity); *State v. Hartman*, 703 S.W.2d 106, 119 (Tenn.1985) (abduction and vicious rape of victim in remote wooded area created a jury issue on torture and depravity); *see also State v. House*, 743 S.W.2d 141 (Tenn.1987) (evidence supported this circumstance where defendant lured victim from home at night under pretense that her husband had been in automobile wreck only to assault, rape and murder her).

## XVI

The Defendant, in his final issue, questions the constitutionality of the Tennessee death penalty statute. The Defendant contends that the aggravating circumstance found in 39-2-203(i)(5) (the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind) is unconstitutionally vague and overbroad under the recent United States Supreme Court decision of *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). This identical argument was addressed and rejected in our recent decision of *State v. Thompson*, 768 S.W.2d 239 (Tenn.1989). *See also Clemons v. Mississippi*, —— U.S. ——, 110 S.Ct. 1441, 1449–1450, 1451, 108 L.Ed.2d 725 (1990) (impliedly approving Mississippi Supreme Court's construction of "especially heinous" as limited to "conscienceless or pitiless and unnecessarily torturous").

The Defendant also argues that the court's charge at sentencing informing

the jury of all eight statutory mitigating circumstances was error under State and Federal law. While this Court has held that only those mitigating circumstances raised by the evidence should be charged, *State v. Buck*, 670 S.W.2d 600, 608 (Tenn. 1984), in the absence of a showing of prejudice, this error would generally benefit the Defendant and does not require reversal. *See State v. Carter*, 714 S.W.2d at 251. Defendant next argues that the failure of the instructions to limit the mitigating factors that the jury may consider results in the sentencer's unchanneled discretion contrary to *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Since the rule is clear, however, that a sentencer at a capital trial may not be precluded from considering any relevant mitigating evidence, see *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 1670–1671, 90 L.Ed.2d 1 (1986), there is no merit to this argument.

 Defendant also asserts that the statute's failure to require the jury to list the mitigating circumstances it finds prevents adequate appellate review. The United States Supreme Court recently rejected this very argument in *Clemons v. Mississippi*, 110 S.Ct. at 1449. The Defendant's final argument is that the Tennessee statute, specifically T.C.A. § 39–2–203(f), requires the sentencer to unanimously determine the existence of a mitigating circumstance before the jury may consider it contrary to the dictates of *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Under the Tennessee statute, which contains none of the features found objectionable in *Mills*, the jury need not agree upon the existence of any mitigating factors and each individual juror is free to consider any circumstances he or she may deem mitigating in reaching a decision. *State v. Thompson*, 768 S.W.2d at 250–252.

 We have reviewed the sentence of death in accord with the mandates of T.C.A. § 39–2–205 and are satisfied that the evidence warrants imposition of that penalty. Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. *See, e.g., State v. House*, 743 S.W.2d 141; *State v. Hartman*, 703 S.W.2d 106. The sentence of death will be carried out as provided by law on the 24th day of July, 1990, unless otherwise ordered by this Court or by other proper authority. Costs are adjudged against the Defendant.

FONES, COOPER, HARBISON and O'BRIEN, JJ., concur.