IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 25, 2005

## STATE OF TENNESSEE v. RODNEY SOUTHERS

**Appeal from the Criminal Court for Hamilton County**
**No. 240245     Stephen M. Bevil, Judge**

_____

### No. E2004-01136-CCA-R3-CD - Filed April 7, 2005

_____

The defendant, Rodney Southers, originally charged with aggravated robbery, was convicted of robbery. The trial court imposed a Range I, six-year sentence. In this appeal, the defendant asserts (1) that the trial court erred by refusing to suppress his pretrial statement and (2) that the trial court erred by denying his request for a special jury instruction. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Mike A. Little, Chattanooga, Tennessee, for the appellant, Rodney Southers.

Paul G. Summers, Attorney General & Reporter; Renee W. Turner, Assistant Attorney General; and Boyd Patterson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On December 13, 2001, a black male walked into the Pizza Hut on South Broad Street in Chattanooga. According to Ramone Gifford, the manager on duty, the perpetrator, who was wearing a hooded blue pullover sweatshirt and holding a red knit mask to his face, placed a gun on the counter. Gifford stated that in response, he took money from the register, placed it into a plastic Pizza Hut bag, and laid the bag on the counter. At that point, the gunman mumbled something that Gifford, "from previous experience," interpreted as a directive to turn around and walk away. Gifford walked into the dish room and heard the perpetrator leave approximately thirty seconds later. When he looked out the back window, he saw the perpetrator enter the passenger side of "a large white vehicle [that] resembled a Mercury Grand Marquis or Crown Victoria." After committing the license tag number, FDM-907, to memory, Gifford returned to the front of the store and activated the alarm. Within forty-five minutes, police found the vehicle and Gifford, accompanied by an

investigator, "pointed out the car before [they] even stopped." He explained, "They didn't show me a car, I showed it to them." Gifford testified that $147 was taken in the robbery.

Eric Milchak of the Chattanooga Police Department was patrolling in Alton Park on the night of the robbery when he heard a call from dispatch to be on the lookout for a white Ford LTD. Shortly after the call, he saw a vehicle matching that description with license tag number FDH-907 parked in the area. After determining that the hood of the vehicle was warm, he informed Detective Bryden of his discovery.

Detective Jeff Bryden of the Chattanooga Police Department, who responded to the robbery call, was contacted by Officer Milchak within fifteen minutes of his interview with Gifford at the Pizza Hut. When Detective Bryden drove Gifford to the area where the suspect vehicle was located, Gifford immediately identified the car as the getaway vehicle. The vehicle was towed to the police department, searched, and processed for fingerprints. Detective Bryden found a registration in the name of Lisa Harris, the girlfriend of the defendant's cousin, Jermaine Southers, and a probation identification card that belonged to Jermaine Southers. After making the discovery, the detective conducted interviews of both Southers and Ms. Harris, at which point, "the investigation pointed towards the defendant."

According to Detective Bryden, he read a waiver of rights form to the defendant and the defendant signed the form in his presence. When questioned about the robbery, the defendant responded, "I did it." The defendant provided an audio taped statement, wherein he admitted that he committed the robbery. He stated that he parked his cousin's car near the back door, walked into the Pizza Hut, and pointed a .380 pistol at the clerk. The defendant acknowledged that the clerk placed the money into a plastic bag and handed it to him. He stated that he disposed of the bag and gun in a housing project on his way to the Boy's Club. During cross-examination, Detective Bryden acknowledged that he could not recall if he had viewed the surveillance video from the Pizza Hut. He stated, however, that it is his general practice to review such videotapes.

Vita Tally, general manager of the Pizza Hut, testified that she verified the amount of money taken in the robbery, $147, and reviewed the surveillance video from the previous evening. Ms. Tally recalled that the videotape depicted images which were taken from two different cameras pointed at different locations. According to Ms. Tally, the images from the camera pointed at the front door were distorted by the glare of lights from the game room and "you couldn't really see anything from that angle." She explained that the second camera, which was pointed at the cash register, captured only the image of "a gun and the end of fingers." Ms. Tally acknowledged that the videotape was not taken by the police and that it had been taped over many times by the time of trial.

Jermaine Southers, a cousin of the defendant, had testified as a witness for the state during the defendant's first trial, which ended in a mistrial. After Southers was declared an unavailable witness by the trial court in this trial, the transcript of his testimony was read into evidence. Southers' testimony was that at the time of the robbery he owned a "white LTD Crown Buick." On the evening of the robbery, he was playing basketball at the Boy's Club when it began to rain.

According to Southers, he gave his car keys to the defendant and asked him to roll up the windows. He recalled that he had just sat down to eat dinner when the defendant went outside and that he was finishing his dessert by the time the defendant came back. Shortly after the defendant's return, someone informed Southers that the police were standing next to his car. Approximately two days later, Southers learned that he was wanted for questioning in connection with the robbery of the Pizza Hut. He testified that he gave a statement to the police denying any involvement in the robbery. Southers recalled that the defendant was wearing a "a blue like coat . . . and some gray Reeboks" on the night of the robbery.

I

The defendant first asserts that the trial court erred by refusing to suppress the statement he provided to Detective Bryden. He claims that the statement was the product of coercion and that he was not fully advised of his rights. In response, the state submits that the requirements of Miranda were met and that the statement was voluntarily given.

At the suppression hearing, Detective Bryden testified that he had asked a Detective Evans, who was a friend of the defendant's family, to escort the defendant to the police station for questioning. While he was aware that the defendant was only seventeen years old at that time, Detective Bryden explained that he also knew that the defendant had been declared an adult in an unrelated robbery case and had entered a plea of guilty in the criminal court. Detective Bryden testified that he read the waiver of rights form to the defendant before asking him to sign the document and confirmed that he understood his rights before the interrogation.

On cross-examination, Detective Bryden, who acknowledged that the defendant's mother was not present during the interview, described the defendant as in custody during the interrogation because of an arrest warrant in an unrelated case. He conceded that he did not inquire about the defendant's educational background but asserted that the defendant was able to read aloud a portion of the waiver of rights form. Detective Bryden denied having threatened to charge the defendant with four additional aggravated robberies unless he confessed.

The defendant, who had dropped out of school in the ninth grade, admitted that he was able to read and write but insisted that Detective Bryden informed him that if he were convicted of four robberies he could receive a sentence of forty-eight years. While acknowledging that the detective made no promise in exchange for his statement, the defendant testified that he admitted robbing the Pizza Hut only because he did not want to be charged with the other three robberies. Although he conceded that he read the waiver of rights form and that Detective Bryden read the form aloud to him, he claimed that he did not understand it. According to the defendant, he believed that if he gave a statement he "was going to come to jail and make bond and tell [his] lawyer what happened, because [he] didn't want to get charged [with] them four robberies." The defendant contended that he did not fully understand that the statement could be used against him at trial.

During cross-examination, the defendant acknowledged that he had previously entered pleas of guilt to charges of attempted aggravated robbery and robbery. The defendant also conceded that

Detective Evans had spoken with his mother before taking him to the police station for questioning. The defendant stated that his mother did not accompany them because he told her that he had not committed the crime.

Detective Charles Wells, who was present during the interview, testified as a rebuttal witness for the state. He recalled that as the defendant read the waiver of rights form, he asked the definition of the word "coercion," to which Detective Wells responded, "[W]e weren't attempting to trick him into signing it, we weren't trying to get him to sign something that he didn't understand or he wasn't there to say something, that wasn't understood by him." Detective Wells testified that the defendant never denied robbing the Pizza Hut.

At the conclusion of the hearing, the trial court made the following observations:

He may have had . . . a limited formal education . . . and only finished the eighth grade, but, of course, the evidence before the court is he had been through the system before.

He has, as a matter of fact, stood before this court and entered a plea of guilty. And certainly I wouldn't have taken his plea if there would have been any indications that he didn't understand what he was doing. . . .

And there was nothing there that would indicate to me that he did not understand it. As a matter of fact, he said he did. Then the officers asked him, they read his rights to him, said do you understand it, he said he did. On the tapes they said, "We've just gone over your rights, do you understand them?" And he said, "Yes, I do."

All that, coupled with the fact that your argument and his testimony are really different. Because he's not saying in his testimony that he didn't understand his rights, he's saying "I admitted I did that because I didn't want to get charged with four robberies."

. . . .

Having been through [the] system before and having been charged with robbery before and pleading guilty to either robbery or attempted robbery, he certainly knew what that was about. And I find his testimony somewhat incredible that he would go ahead and admit to a robbery after he had already been through the system and pled guilty to a robbery and sit there and admit doing it, because he would have known, having been through the system before, that he had a right to a trial if he wanted one, because that's one of the things I go over with a person when they plead guilty. And I find his story somewhat incredible that "I admitted I did this because I didn't want to get charged with four robberies."

There's nothing in the tape itself from his mouth that indicates that that was a fabrication, that he didn't know what he was doing. So I find it was a statement that was knowingly and voluntarily, understandingly and intelligently given, despite his limited formal education; and, therefore, let the motion to suppress be overruled.

The standard of review applicable to suppression issues is well established. When the trial court makes a finding of facts at the conclusion of a suppression hearing, the facts are accorded the weight of a jury verdict. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). The trial court's findings are binding upon this court unless the evidence in the record preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); see also Stephenson, 878 S.W.2d at 544; State v. Goforth, 678 S.W.2d 477, 479 (Tenn. Crim. App. 1984). Questions of credibility of witnesses, the weight and value of the evidence and resolution of conflicts in evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence. Odom, 928 S.W.2d at 23. This court's review of a trial court's application of law to the facts, however, is conducted under a de novo standard of review. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001); State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999).

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to effect a waiver, the accused must be adequately apprised of his right to remain silent and the consequence of deciding to abandon the right. Stephenson, 878 S.W.2d at 544-45. In determining whether a confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. This court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda, the United States Supreme Court limited its holding to a "custodial interrogation." Miranda, 384 U.S. at 478-79. The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant way." Id. at 444. A person is "in custody" within the meaning of Miranda if there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted). The Court has refused to extend the holding in Miranda to non-custodial interrogations. See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that an accused's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest). In determining whether a reasonable person would consider himself or herself in custody, our supreme court considers a variety of factors, including the following:

> "[T]he time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will."

State v. Walton, 41 S.W.3d at 82-83 (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)).

Here, the defendant concedes that he was informed of his Miranda rights but argues that, because of his youth, he did not understand them. The state contends that although the defendant was only seventeen years old at the time of the interrogation, he was adequately familiar with the criminal justice system because he had recently entered guilty pleas as an adult.

In State v. Gordon, 642 S.W.2d 742, 745 (Tenn. Crim. App. 1982), this court ruled that when full Miranda warnings have been provided and understood, the voluntariness and admissibility of a juvenile's confession is not dependent upon the presence of his parents at the interrogation. See also State v. Turnmire, 762 S.W.2d 893 (Tenn. Crim. App. 1988). The appropriate standard for determining admissibility is "whether, under the totality of the circumstances, the . . . confession was the result of a knowing and intelligent waiver of . . . constitutional rights." State v. Lundy, 808 S.W.2d 444, 446 (Tenn. 1991). Our supreme court has held that the court must consider the following factors:

> (1) . . . all circumstances surrounding the interrogation including the juvenile's age, experience, education, and intelligence;

(2) the juvenile's capacity to understand the <u>Miranda</u> warnings and the consequences of the waiver;

(3) the juvenile's familiarity with Miranda warnings or the ability to read and write in the language used to give the warnings;

(4) any intoxication;

(5) any mental disease, disorder, or retardation; and

(6) the presence of a parent, guardian, or interested adult.

<u>State v. Callahan</u>, 979 S.W.2d 577, 583 (Tenn. 1997). Our high court also determined that "[w]hile courts shall exercise special care in scrutinizing purported waivers by juvenile suspects, no single factor such as mental condition or education should by itself render a confession unconstitutional absent coercive police activity." <u>Id.</u> (citing <u>Colorado v. Connelly</u>, 479 U.S. 157 (1986)).

The law provides that confessions obtained through the use of either physical or psychological coercion must be suppressed. <u>See</u> <u>Rogers v. Richmond</u>, 365 U.S. 534, 540-41 (1961). A statement will not be rendered involuntary, however, when officers have, without more, promised general assistance. <u>See</u> <u>State v. Johnson</u>, 765 S.W.2d 780, 782 (Tenn. Crim App. 1988). The critical question is "'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined -- a question to be answered with complete disregard of whether or not the petitioner in fact spoke the truth.'" <u>State v. Kelly</u>, 603 S.W.2d 726, 728 (Tenn. 1980) (quoting <u>Rogers</u>, 365 U.S. at 544).

In this instance, the seventeen-year-old defendant, who dropped out of school in the ninth grade, agreed to accompany Detective Evans, a family friend, to the police station after having been informed that the police sought him for questioning. Because he had recently entered guilty pleas as an adult, the defendant had some familiarity with the criminal justice system. The record establishes that the defendant could read and write and that he fully understood the <u>Miranda</u> warnings. There was no indication that he was either intoxicated or suffered any diminished mental capacity. Although the defendant's mother was not present during the interrogation, there was testimony that Detective Evans spoke with her before taking the defendant to the police station. The defendant acknowledged that he explained to his mother that her presence was not necessary. The trial court accredited the testimony offered by the state at the suppression hearing and specifically rejected the defendant's claim that he admitted to the crime only because of the threat of prosecution on other charges. In our view, the evidence does not preponderate against the trial court's finding that the defendant's statement was knowingly, voluntarily, and intelligently made.

II

The defendant also asserts that the trial court erred by refusing to charge his specially requested jury instruction on the state's duty to preserve evidence. He claims that the instruction was necessary because the surveillance videotape had not been collected and preserved by the state. The state submits that because the evidence was not exculpatory, the trial court did not err by refusing to provide the instruction.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury. U.S. Const. amend VI; Tenn. Const. art. 1, § 6; see State v. Bobo, 814 S.W.2d 353, 356 (Tenn. 1991); Willard v. State, 174 Tenn. 642, 130 S.W.2d 99 (1939). This right encompasses the defendant's right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30. Jury instructions must, however, be reviewed in the context of the overall charge rather than in isolation. See Sandstrom v. Montana, 442 U.S. 510 (1979); see also State v. Phipps, 883 S.W.2d 138, 142 (Tenn. Crim. App. 1994). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

While the defendant may request special instructions, jury instructions are sufficient where they adequately state the law. See, e.g., State v. Tyson, 603 S.W.2d 748 (Tenn. Crim. App. 1980). When a trial court's charge to the jury is complete, it need not give additional special instructions requested by the defendant. See State v. Story, 608 S.W.2d 599, 603 (Tenn. Crim. App. 1980).

In Arizona v. Youngblood, 488 U.S. 51 (1988), the United States Supreme Court held that a criminal defendant must show bad faith on the part of the state in order to establish a denial of due process for failure to preserve potentially useful evidence. In State v. Ferguson, 2 S.W.3d 912, 917 (Tenn. 1999), however, where the police lost a videotape of the defendant's field sobriety tests, our supreme court rejected the bad faith requirement articulated in Youngblood. Our high court concluded that the due process principles of the Tennessee Constitution are broader than those enunciated in the United States Constitution and that fundamental fairness, as an element of due process, requires that the state's failure to preserve evidence which could be favorable to the defendant be evaluated in the context of the entire record. Ferguson, 2 S.W.3d at 916-17. If the state has a duty to preserve the evidence, the reviewing court must conduct a balancing test based upon the following three factors:

(1) the degree of negligence involved;
(2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and
(3) the sufficiency of the other evidence against the defendant.

Id. at 917. If a trial without the lost or destroyed evidence would be unfair, the trial court may dismiss the charges, provide a jury instruction, or take other steps necessary to protect the defendant's right to a fair trial. Id.

Here, the defendant argued that the state had a duty to preserve the videotape taken from the surveillance cameras in the Pizza Hut because the tape might have been useful to his defense. At trial, Ms. Tally testified that she reviewed the videotape six or more times and that there was essentially nothing helpful to either the state or the defense. She stated that one of the cameras captured the image of a person entering the front door but explained that the figure was largely

obscured by the glare of the lights from the game room. None of the perpetrator's features were discernable. According to Ms. Tally, the second camera caught only the image of a gun on the counter with the perpetrator's fingers on top. Ms. Tally was thoroughly cross-examined as to the contents of the videotape. In our view, the defendant has failed to establish that the videotape contained evidence favorable to the defense. See id. at 916-17. In consequence, the trial court did not err by denying the specially requested instruction on the duty to preserve evidence.

Accordingly, the judgment of the trial court is affirmed.

 

_____
GARY R. WADE, PRESIDING JUDGE