IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MARCH 1996 SESSION

FILED

June 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 03C01-9507-CC-00188 |
| | ) | |
| | ) | Claiborne County |
| v. | ) | |
| | ) | Honorable Lee Asbury, Judge |
| | ) | |
| TERRY FRANKLIN STOGDILL, | ) | (Rape of a child and incest) |
| | ) | |
| Appellant. | ) | |

For the Appellant:

Martha J. Yoakum
District Public Defender
P.O. Box 386
Tazewell, TN 37879-0386
(AT TRIAL AND ON APPEAL)

Charles Herman
John Beaty
John McAfee
Assistant Public Defenders
P.O. Box 386
Tazewell, TN 37879-0386
(AT TRIAL)

For the Appellee:

Charles W. Burson
Attorney General of Tennessee
        and
Michael J. Fahey
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493

William Paul Phillips
District Attorney General
P.O. Box 10
Huntsville, TN 37756-0010
        and
Shayne Sexton
Assistant District Attorney General
P.O. Box 455
Tazewell, TN 37879-0455

OPINION FILED:_____

AFFIRMED

Joseph M. Tipton
Judge

# O P I N I O N

The defendant, Terry Franklin Stogdill, appeals as of right from his convictions by a jury in the Claiborne County Criminal Court for rape of a child, a Class A felony, and incest, a Class C felony. The defendant was sentenced as a Range I, standard offender to concurrent sentences of twenty years and five years in the custody of the Department of Correction. On appeal, the defendant contends that:

> (1) the trial court erred by denying his motion for a continuance to obtain a forensic evaluation;
>
> (2) the trial court erred by denying his motion to suppress the defendant's statement;
>
> (3) the trial court erred by denying his motion to require the state to elect at the close of its proof the particular offense for which it sought a conviction for each count of the indictment; and
>
> (4) the trial court erred by misapplying an enhancement factor.

We affirm the judgments of conviction.

Lieutenant Ben Evans of the Claiborne County Sheriff's Department testified that he along with Mike Cosby from the Department of Human Services went to the defendant's residence on February 4, 1994, at approximately 2:45 p.m. to interview the defendant. He stated that when he introduced himself and Mr. Cosby to the defendant and told him that they were investigating allegations that the defendant sexually abused his seven-year-old stepdaughter, the defendant invited them inside and told them that he had been expecting them. Lieutenant Evans testified that he informed the defendant that the victim accused him of penetrating her by putting his penis in her mouth and by inserting his fingers and penis inside her vagina during the snowstorm that occurred in January 1994.

Lieutenant Evans stated the defendant then gave a statement. He said that Dawn Stogdill, the victim's mother and the defendant's wife at the time, was also

2

present during the interview. Lieutenant Evans believed that the defendant acted remorseful and appeared to have a hard time remembering things. He said that the defendant had tears in his eyes and confessed that he needed help. He testified that although the defendant told him that he had taken three types of medication, he believed that the defendant understood everything and answered his questions appropriately.

The defendant's statement was introduced into evidence and read to the jury. The statement reflects that the defendant recalled an incident occurring more than one year earlier at his home located in the Cape Norris area. Although the defendant could not recall the exact date or time and he stated that he did not remember what happened, the defendant told Lieutenant Evans that he remembered masturbating in front of the victim in the living room while the rest of the family was asleep.

In his statement, the defendant told Lieutenant Evans that the first time that he physically touched the victim was in January 1993 just before moving to the residence located next to Hickman's Junkyard. The statement reflects that the defendant stated that at approximately noon while the other children were sleeping and his wife was at work, he rubbed the victim on the outside of her clothing on her legs and between her legs for approximately ten or fifteen minutes. The defendant told Lieutenant Evans that afterwards he went inside his bedroom and masturbated. The defendant described his actions as a "want to touch thing," and he said that he was not "really attracted to [the victim]." The defendant conceded that something else may have happened, but he claimed that he could not remember. He explained that he was taking a lot of medication, including Anaprox, Talwin and Ativan, and that he might have a mental block, making it hard to remember.

3

The statement also shows that the defendant recalled an incident occurring toward the last part of the snowstorm in January 1994 at the residence located next to Hickman's Junkyard. The defendant told Lieutenant Evans that the victim approached him while he was sitting in his bath wrap in a chair in the living room and asked the defendant, "'Can we do it?'" The defendant stated that he told the victim that it was not right. He admitted that he should have told the victim's mother and asked her to talk to the victim. The defendant's statement shows that the defendant conceded that he had done wrong and needed help.

The defendant also said that he did not remember, as alleged by the victim, putting his penis inside the victim's mouth and ejaculating, touching the victim's vagina with his penis, and sticking his finger inside the victim's vagina. However, without specifying the time or the location of the incidents, he conceded that it was possible that the actions occurred. The defendant recalled that the victim grabbed his penis a couple of times, although he could not remember when it took place. The defendant claimed that the victim never acted scared or acted as if she wanted the defendant to quit.

Mary Palmer Campbell, a pediatrician, testified that she examined the victim on February 17, 1994. She said that the victim was very cooperative, although she testified that the victim was hesitant to tell her what happened. Dr. Campbell stated that the victim stopped telling her what happened at one point and also told her to talk to the counselor for the Department of Human Services that had interviewed her. Dr. Campbell testified that the victim reported being constipated, and she said that constipation can be associated with abuse, although it could be normal also. She also stated that her examination revealed a thickening and rolling of a portion of the victim's, hymen, scar tissue at the bottom of the opening of the hymen, and an opening in the hymen. In Dr. Campbell's opinion, the thickened and rolled hymen was consistent with

4

penetration of the vagina, although the opening in the hymen was within the normal limits. Dr. Campbell testified that the rectal examination showed that the skin had been torn and had healed deeper. In her summary report, Dr. Campbell stated that in her opinion, the victim had a history "dramatically consistent with sexual abuse." Dr. Campbell also expressed the opinion that the results of the examination were consistent with penetrating trauma to the vagina and possibly to the rectum.

On cross-examination, Dr. Campbell testified that when the victim stopped telling her what happened and told her that she could not remember, Dr. Campbell asked the victim whether something happened and the victim responded yes or no to her questions. She stated on redirect examination that the injury to the victim's hymen would have been painful.

Dawn Johnson, the defendant's ex-wife, testified that she was married to the defendant at the time of the offenses. She said that she and the defendant moved to Tennessee in February 1992. She stated that she and the defendant rented a house from her parents in Cape Norris for approximately one year beginning in March 1992. Ms. Johnson testified that about March 1993, they moved next to Hickman's Junkyard. She stated that in October 1993 while at their home near Hickman's Junkyard, she asked the victim whether the defendant had been "messing with her" and the victim responded affirmatively. Ms. Johnson said that when she confronted the defendant, he admitted his guilt, telling her that he had touched the victim's privates and had rubbed himself on her. She testified that she had earlier experienced problems with ovarian cysts. Ms. Johnson testified that she and the victim moved to the home of Ms. Johnson's parents, the victim's grandparents, in October 1993, but she did not tell anyone what happened.

5

Ms. Johnson stated that she later moved back in with the defendant in December 1993, but the victim lived with her grandparents until January 17, 1994, when the victim stayed with her and the defendant because her grandparent's house caught on fire. She said that the victim slept on the living room floor. Ms. Johnson recalled that a snowstorm occurred while the victim was staying with them, causing them to be unable to leave the house. She said that on February 3, 1994, she learned that the victim had told Ms. Johnson's sister that the defendant had abused the victim and that Ms. Johnson's mother had called the Department of Human Services. Ms. Johnson testified that she told the defendant about the victim's allegations and that the police were coming to question him the next day.

She said that the defendant acted nervous and scared and that he did not go to work. She stated that the defendant told her that during the morning before being interviewed by the police, he spent most of his time in the woods with a gun in his hand. Ms. Johnson believed that the defendant acted normally on February 4, 1994, when Lieutenant Evans and Mr. Cosby came to talk to the defendant. She stated that she also gave a statement to the police. She stated that the following night the defendant went to Oakwood Medical Center for detoxification. Ms. Johnson testified that after leaving the center, the defendant told her that he planned on returning for treatment in the psychiatric ward of the center. She said that the defendant told her that he had to be suicidal to be admitted, and she claimed that in order to get the defendant admitted, she lied by stating that the defendant had heard voices and was suicidal.

On cross-examination, Ms. Johnson admitted that she knew in January 1992 that something had happened between the defendant and the victim because the defendant had been accused of sexual abuse in another state. She said that the victim told her that the defendant touched her private parts and rubbed his penis between her legs. Ms. Johnson testified that she believed that the victim was telling the truth. Ms.

6

Johnson also conceded that her statement reflects that the victim revealed to her that the defendant rubbed his penis on the victim's leg, but she claimed that the officer incorrectly wrote down her answer. She explained that she failed to correct the inaccuracy because it was a hectic day. Ms. Johnson stated that she told the officer that the victim had been acting weird for approximately three to four months before revealing what had happened. She explained that the victim often asked for a night light, and she eventually gave her one. Ms. Johnson testified that the victim's weird conduct prompted her to ask the victim whether the defendant had done anything to her. She denied that the victim did not like the defendant, and she said that the victim was scared of the defendant.

The victim testified that she knew the difference between a good touch and a bad touch. She explained that a bad touch is when someone touches her private parts. The victim testified that she remembered living in a house that belonged to her grandparents in Cape Norris. She said that the defendant, whom she called "Daddy," touched her more than once while living in that house. She stated that the defendant touched her during the daytime in her mother's bedroom while her mother was at work and her brothers and sisters were napping. The victim explained that she was in her bedroom when the defendant, standing in the hallway, whistled at her and told her to come to him. She said that both she and the defendant were wearing pants and a shirt. The victim testified that the defendant touched her between her legs where she urinates, sticking his finger inside her. She said that although it did not last long, it hurt.

The victim testified that the defendant did not say anything to her before he stuck his finger inside her vagina. She stated that when he finished, the defendant told her not to tell anyone. She said that she eventually told her mother that the defendant had been touching her in inappropriate places. The victim testified that she

7

did not tell her mother what the defendant had done until they moved to the residence next to Hickman's Junkyard some time in 1993. She said that approximately three or four days after telling her mother about the defendant's conduct, her mother took the victim to live with her grandparents. The victim stated that she also told her aunt about the defendant's conduct. On cross-examination, the victim testified that she could not remember the date that the incident at the Cape Norris residence occurred.

The victim testified that around Christmas in 1993, she stayed with her mother and the defendant for approximately two and a half weeks at the residence located next to Hickman's Junkyard. She stated that she remembered having a big snowfall while staying there, causing them to be unable to leave the house. She testified that one morning, the defendant came into the living room where she was sleeping and turned on the television. She said that the defendant, who was wearing a black robe, sat in a chair in the living room and told her to come to him. The victim stated that the rest of her family was asleep. She said that she went to see what the defendant wanted, believing that he was going to give her something. The victim, who was wearing a nightgown, said that the defendant then pulled her panties down and stuck his finger inside her vagina as she was standing beside the chair. She stated that at one point, she tried to get away from the defendant. The victim testified that it hurt when the defendant stuck his finger inside her. She said that after the snowstorm, she moved back to live with her grandparents. The victim stated that she never told her mother what the defendant did during the snowstorm, but she did tell her aunt.

On cross-examination, the victim acknowledged that she had earlier testified at the preliminary hearing that the defendant did not stick his private part inside her and that she did not see the defendant's private part. She conceded that she stated at the preliminary hearing that the defendant did not do anything to her on the day of the snowstorm. The victim admitted that she had told someone that if she could

8

be granted three wishes, she wanted to be with her natural father and that her natural father not remarry. She also admitted that she did not like the defendant. The victim testified on redirect examination that she had never liked the defendant. She stated on recross-examination that she also claimed that two of her uncles had touched her on earlier occasions.

No witnesses were called to testify for the defense. Based upon the above proof, the jury convicted the defendant of rape of a child and incest.

## I. CONTINUANCE

The defendant contends that the trial court erroneously denied his motion for a continuance to obtain a forensic evaluation. He argues that a medical report received on December 1, 1994, eight days before the hearing on the motion for a continuance and thirteen days before trial, tends to show that the defendant had a defense based upon his mental condition. Specifically, the defendant asserts that a statement made by Dr. Kenneth Carpenter in the report raised a question regarding the defendant's sanity at the time of the offense:

> It is my speculation that the abuse, if it occurred, was associated with drug behavior and the patient had blackouts at the time. In just talking with him, it is obvious that he has blackouts for a lot of events during the times that he was taking excessive amounts of Talwin.

The defendant argues that it can logically be inferred from Dr. Carpenter's conclusions that the defendant did not know what he was doing at the time of the offenses, and he contends that a continuance was necessary to provide him the opportunity to gather and present evidence in support of an insanity defense. The state responds that the trial court did not abuse its discretion by denying a continuance.

9

On December 9, 1994, a pretrial hearing was conducted on a motion for a continuance filed by the defendant on December 8.[1] In support of his motion, the defendant introduced medical discharge summaries reflecting that the defendant obtained treatment at Oakwood Medical Center from February 5 to February 9, 1994, was readmitted on February 10 because of depression and threats to kill himself with a handgun, and he received treatment through February 21, 1994.

The medical records state that the defendant reported taking daily quantities of several prescription drugs. They reflect that the defendant was under the influence and in a "blackout of multiple drugs" at the time of the offenses. They show that while at the medical center, the defendant received treatment for his alcohol and opiate dependence. The medical records also show that the defendant had a history of depression and suicidal tendencies and he heard voices telling him to kill himself, had difficulty sleeping, and experienced continuous crying spells and feelings of being watched by someone. The defendant reported that he had no recollection of committing the offenses or giving a statement to the police. The medical records state that the fact that the defendant's "mental status was clouded related to the multiple drug ingestion such that he was having auditory hallucinosis and some of the voices . . . were telling him to kill himself." Regarding the auditory hallucinosis, the records state that the defendant had heard voices for four years and that it may be secondary to drugs.

The medical records state that the defendant was initially diagnosed as having dysthymia, but upon re-evaluation, the diagnosis was changed to major depression with psychotic features. The defendant was later diagnosed as having recurrent, major depression with non-psychotic features. The records reflect that the

---

[1] The record on appeal does not contain the defendant's motion for a continuance. The transcript of the continuance hearing reflects that the motion alleged that a psychiatric, forensic evaluation was necessary because the defendant suffered serious mental, physical, emotional and psychiatric problems.

treating physician requested that the defendant have a consultation for evaluation for group therapy and a possible transfer to the psychiatric services for primary psychiatric treatment, but the defendant was released before a consultation was conducted. On February 21, the defendant was discharged but was ordered to follow up treatment with a program at Child and Family Services and, if that failed, to attend Cherokee Mental Health Center. The record does not reflect whether follow-up treatment was obtained.

At the hearing, the state argued that the motion for a continuance was untimely and that the medical records did not support a showing that a continuance was necessary to determine the issues of the defendant's competency to stand trial or his sanity at the time of the offense. The state asserted that the defendant had access to the February 5 through 9 medical records on June 21, 1994, approximately two months before the defendant was indicted, and those records set forth a similar medical history. The defendant explained that the delay in filing the motion was a result of not receiving the February 10 through 21 medical records until December 1. He stated that although he requested the defendant's medical records in June, the only medical records furnished to him at that time were the February 5 through 9 records. The defendant argued that although the defendant's competency to stand trial was not of great concern, a continuance was necessary to evaluate the defendant's sanity at the time of the offenses.

The trial court denied the defendant's motion for a continuance. It noted that the issue was not one of timeliness because the defendant's sanity was at issue. The court ruled that the medical records did not indicate the type of condition that would require a forensic evaluation. In its decision, the trial court stated that the defendant's problem apparently stems from depression and drugs.

Pursuant to T.C.A. § 33-7-301(a), the trial court, in its discretion, may order the defendant to be evaluated if the defendant is believed to be incompetent to stand trial or there is a question as to the defendant's mental capacity at the time of the commission of the offense. State v. Rhoden, 739 S.W.2d 6, 16 (Tenn. Crim. App. 1987). The trial court's decision to deny a psychiatric evaluation will not be reversed on appeal absent a showing that the trial court abused its discretion. State v. Lane, 689 S.W.2d 202, 204 (Tenn. Crim. App. 1984).

The granting of a continuance also rests within the sound discretion of the trial court. Moorehead v. State, 219 Tenn. 271, 274-75, 409 S.W.2d 357, 358 (1966). A reversal may only occur if the denial was an abuse of discretion and the defendant was improperly prejudiced in that a different result might reasonably have been reached if the continuance had been granted. See State v. Dykes, 803 S.W.2d 250, 257 (Tenn. Crim. App. 1990). Thus, it is incumbent upon the defendant to show that he was prejudiced. In Morehead, our supreme court stated that the trial court's exercise of discretion will not be disturbed on appeal "unless something is developed in the after trial to show that the defendant might have been prejudiced in some way by the refusal to grant a continuance." 219 Tenn. at 275, 409 S.W.2d at 358-59.

The evidence submitted regarding the defendant's mental status was not substantial. Moreover, the medical records, taken as a whole, show that the defendant experienced blackouts at the time of the offense as a result of his drug usage, not because of a mental disease or defect. Under these circumstances, we cannot say that the trial court abused its discretion by denying the motion for a continuance.

Furthermore, the defendant has failed to meet his burden of demonstrating that he was prejudiced by the denial of a continuance. He has not demonstrated that had a continuance been granted and an evaluation conducted, the

12

findings of the evaluation would have been that the defendant was mentally incapacitated at the time of the offenses. The defendant did not introduce any additional evidence at the motion for new trial to support a showing of prejudice. It is the burden of the defendant to clearly show that prejudice resulted from the denial of a continuance, rather than leaving this court to speculate how the defendant was prejudiced. See State v. Teel, 793 S.W.2d 236, 245 (Tenn. Crim. App. 1990). He has failed to meet his burden in this case. For these reasons, we hold that the trial court properly denied a continuance.

## II. SUPPRESSION OF STATEMENT

The defendant asserts that the trial court erred by denying his motion to suppress the statement given to Lieutenant Evans. He argues that the statement was not given voluntarily because the defendant was under the influence of drugs. The defendant, citing Dukes v. State, 578 S.W.2d 659 (Tenn. Crim. App. 1978), contends that the proof shows that the defendant was unable to make a definitive narrative of all past events or to state his own participation in the crimes. The state responds that the trial court properly allowed the statement into evidence because the proof did not demonstrate that the defendant was under the influence of drugs at the time of statement. We hold that the trial court did not err.

Before trial, the defendant filed a motion to suppress the statement he gave to police. The defendant alleged that he did not knowingly and voluntarily waive his rights and give a statement because he was under the influence of prescribed medications that interfered with his ability to understand his rights or to give a statement.

A hearing was conducted on the motion to suppress on December 13, 1994. Lieutenant Evans testified that as part of his investigation, he along with Mike

13

Cosby of the Department of Human Services went to the defendant's residence at approximately 2:48 p.m. on February 4, 1994, to interview the defendant. Lieutenant Evans testified that when he arrived, he introduced himself to the defendant, told the defendant that he was there to investigate allegations that the defendant sexually abused the victim, and asked to speak to him. He stated that the defendant invited them inside and told them that he had been expecting them.

Lieutenant Evans testified that he advised the defendant of his Miranda rights before questioning the defendant and the defendant signed the waiver of rights form. He explained that because the defendant told him that he could not read well, he read each line and asked the defendant whether he understood each particular right. Lieutenant Evans stated that the defendant said that he understood his rights. He said that he then took the defendant's statement in the living room in the presence of Dawn Stogdill and Mr. Cosby. According to Lieutenant Evans, the interview lasted approximately thirty minutes. He stated that the defendant's answers were responsive to his questions. Lieutenant Evans explained that he transcribed the defendant's answers to his questions, but he asked the defendant to read the statement when it was completed and to point out any mistakes to be corrected. Lieutenant Evans testified that the defendant reviewed the statement, stated that it was accurate, and signed the statement. He recalled the defendant having tears in his eyes after signing the statement and stating that he knew that he needed help.

Lieutenant Evans stated that the defendant did not mention any limitations mentally. He also said that the defendant did not tell him that he was under the influence of any drugs, although the defendant did mention that he was taking three different types of medication that the defendant believed might hamper his ability to remember. Lieutenant Evans testified that he had no doubt that the defendant understood what he was doing when he waived his rights and gave the statement.

14

On cross-examination, Lieutenant Evans conceded that he could not recall what medication the defendant told him he had taken. He said that he did not remember the defendant asking him to repeat anything. He stated that he questioned the defendant again on March 7, 1994, at Hickman's Junkyard, where the defendant worked. Lieutenant Evans testified that the defendant told him that he could barely remember talking to him on February 4. He stated that the defendant also told him that he went to Oakwood Medical Center for drug detoxification after giving the statement on February 4. Lieutenant Evans said that the defendant told him that he could not remember anything before going for treatment.

Mike Cosby of the Department of Human Services testified that he accompanied Lieutenant Evans to the defendant's residence on February 4, 1994, and was present during the interview. He said that the defendant did not appear to be under the influence of drugs or alcohol, although the defendant told them that he had taken some medication. He stated that the defendant answered appropriately to the questions that were asked. Mr. Cosby testified that he believed that the defendant understood Lieutenant Evans' questions and understood what was happening.

The defendant testified that he had been depressed for several years after injuring his back. He said that at the time of the statement, he had been taking prescription drugs on a daily basis, including Talwin, Anaprox, Ativan, Elavil, and Zantac. The defendant stated that he took more medication than prescribed before the interview because he experienced bad pain in his back. He said that the day after the interview, he went to Oakwood Medical Center to obtain treatment for his drug abuse. The defendant testified that he stopped taking the drugs after the treatment. He stated that he could not fully remember Lieutenant Evans and Mr. Cosby being at his house in February 1994. The defendant said that he had been under the influence of drugs every day for a long time, and he stated that it caused him to forget things. The

15

defendant claimed that he would not have given a statement had he known what he was doing. He stated that when he spoke to Lieutenant Evans in March, he told Lieutenant Evans that he did not recall giving the statement in February. The defendant conceded that the signature at the bottom of the statement was "close" to being his signature, but he asserted that he did not have any recollection of giving the statement. He blamed his loss of memory on the medication he was taking.

On cross-examination, the defendant conceded that he had worked and driven a car during the six months before giving the statement, a period of time when he was also taking the medications. He also admitted that he was not surprised that the Oakwood Medical Center's records reflect that the only medication detected in the defendant's system was Talwin. The defendant testified that he recalled giving a second statement to Lieutenant Evans on March 7, 1994, stating that he did not recall giving the earlier statement. He admitted that he also gave a statement on April 12, 1994, that reflects that he could not remember what happened between him and the victim.

At the conclusion of the hearing, the trial court overruled the defendant's motion to suppress the statement. The trial court determined that the defendant was capable of knowingly and voluntarily waiving his rights and giving a statement to police.

On appeal, the trial court's findings of fact at the conclusion of a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The defendant bears the burden of demonstrating that the evidence preponderated against the trial court's factual findings. Id. However, the application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

16

In this case, the defendant has failed to establish that the evidence preponderated against the trial court's factual determinations. The evidence shows that Lieutenant Evans testified that the defendant stated that he understood his rights before signing the waiver of rights form. He also said that although the defendant had taken prescription medication, Lieutenant Evans had no doubt that the defendant understood what he was doing when he waived his rights and gave a statement. Mr. Cosby believed that the defendant did not appear to be under the influence of drugs or alcohol and also expressed the opinion that the defendant understood what was happening. We agree that this evidence demonstrates that the defendant knowingly and voluntarily waived his rights and gave a statement. Therefore, we conclude that the defendant's motion to suppress the statement was appropriately denied.

## III. ELECTION OF OFFENSES

The defendant contends that the trial court erred by denying his motion to require the state to elect at the close of its proof the particular incident for which a conviction in each count was being sought. He argues that the failure to require election cannot be considered harmless error because it is impossible to determine whether the jury returned unanimous verdicts. The state asserts that the failure of the trial court to require the state to elect is not reversible error. We agree.

In Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), our supreme court held that the submission of evidence of multiple rapes by the defendant upon the victim when each of the several rapes so proven would meet the allegations of the charge in the indictment made it "the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." Id. at 804; see State v. Rickman, 876 S.W.2d 824, 829 (Tenn. 1994). The court gave three reasons for these requirements:

17

> First, to enable the defendant to prepare for and make his defense to the specific charge; second, to protect him from double jeopardy by individualization of the issue; and third, so that the jury's verdict may not be a matter of choice between offenses, some jurors convicting on one offense and others, another.

Burlison, 501 S.W.2d at 803.

The requirement that the state elect the particular offense upon which it relies for a conviction is "fundamental, immediately touching the constitutional rights of the accused." Id. at 804. As the court stated in Shelton, "the purpose of election is to insure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." 851 S.W.2d at 138.

In this case, the indictment was neither time nor place specific. The indictment charged the defendant in separate counts with committing the crimes of rape and incest "on or about 1993 - February 1994." Moreover, the state's pretrial response to the defendant's motion for a bill of particulars did not limit each charge to a particular incident. Rather, the state responded that the events constituting the charges in counts one and two of the indictment occurred "between the dates of January 1993 - February 1993 at the defendant's then residence, located in the Cape Norris area of Claiborne County, Tennessee, in a home rented from the parents of Dawn Stogdill." It also stated that the events constituting the charges in counts one and two of the indictment took place "between the dates of February 1993 and January 29, 1994, at the defendant's then residence located [in] . . . Claiborne County, Tennessee near Hickman's junkyard."

Though the defendant was indicted for only one count of rape of a child and one count of incest, the state introduced evidence that the defendant digitally penetrated the victim on two separate occasions, once at the Cape Norris residence and another time at the residence next to Hickman's Junkyard. Moreover, during its

18

closing argument, the state summarized the evidence that showed the defendant's guilt

for rape of a child, stating that the victim:

> talked about two incidents, where the defendant put his fingers inside of her. One at Cape Norris, one next to Hickman's Junkyard. Both times, very clear about what happened. He put his fingers inside of me. That is what she said. That is without question.

Also, in rebuttal, the prosecutor argued that:

> [defense counsel] talks about other times and things, other accusations. She was crystal clear about what happened on the two times there. Crystal clear. There is no vague accusation. There is no inconsistency.

The state did not specify during its closing argument which incident it was relying upon

for a conviction for incest. The trial court instructed the jury that it must "give separate

consideration to each count of the indictment and return a separate verdict as to each

count of the indictment."

The lack of indictment specificity and the evidence of multiple offenses

warranted state election and an appropriate jury instruction under Shelton and Brown.

Thus, the trial court's failure to require an election constituted error. However, the

failure to elect may be harmless beyond a reasonable doubt in an appropriate case.

See Shelton, 851 S.W.2d at 138.

In Shelton, the defendant was charged with one count of aggravated rape

of one of his three step-granddaughters and two counts of aggravated sexual battery of

the other two step-granddaughters. The victim of the aggravated rape testified in very

general terms that the defendant digitally penetrated her and her two sisters on more

than one occasion, but described in detail one incident that occurred on her birthday

when the defendant was partially successful at his attempt to penetrate the victim with

his penis. Id. The medical expert testimony was that there were clear signs of sexual

abuse. Id. The court determined that it was error for the trial court to fail to require the

state to elect offenses but concluded that the error with regard to the aggravated rape

19

count was harmless beyond a reasonable doubt because "the jurors must have considered the evidence of this particular incident in convicting the defendant of aggravated rape." Id.

With regard to the remaining two counts of aggravated sexual battery, the court held that the error was not harmless beyond a reasonable doubt. Id. at 139. Important in this determination was the nature of the evidence presented with regard to each charge. Id. One victim testified that the defendant fondled her and digitally penetrated her on more than one occasion, but she did not differentiate one event from the others. Id. With respect to that victim, the medical expert only found evidence of irritation in the victim's genital area. Id. The court reversed the defendant's conviction because in "view of the nature of the evidence and the error resulting from the state's failure to elect," the convictions could not be sustained. Id. The other victim did not testify, and medical proof found no evidence of irritation or any other physical proof. Id. The only proof establishing the offense "was the brief and thoroughly non-specific testimony of the other two victims . . . ." Id. The court not only determined that there was a Burlison error but also concluded that the evidence was insufficient to sustain the conviction. Id.

The state asserts that any error by the state in failing to elect a specific instance for each count is harmless beyond a reasonable doubt. The state argues that similar to the victim's testimony in State v. Shelton, 851 S.W.2d 134 (Tenn. 1993), the victim's most specific testimony in this case concerned the defendant's digital penetration of the victim's vagina in the living room of the defendant's residence near Hickman's Junkyard during the snowstorm in January 1994. However, given the victim's admission during cross-examination that she had stated during the preliminary hearing that the defendant did not do anything to her when she lived near the

20

Hickman's Junkyard, we are not confident that all of the jurors would have agreed beyond a reasonable doubt as to the commission of this offense.

On the other hand, we believe that the record supports a conclusion that the jury unanimously agreed, at least, to the offense described at the Cape Norris residence. That is, similar to Shelton, the risk of a composite jury simply did not exist in this case. The victim provided specific testimony with respect to the offense. The quality and certainty of her testimony as to this incident was strong. Moreover, the defendant's evidence, through his statement, did not have the potential of diminishing the quality of the proof. His statement expressed, at best for him, a lack of recall regarding the offenses and, at worst, the possibility that the offenses occurred.

Also, the primary defense was that the victim was fabricating the episodes. However, given the fact that the jury accredited the victim, there is no basis in the evidence upon which we can doubt the jury being unanimous as to the defendant's guilt of the offense at the Cape Norris residence. Under these circumstances, the Burlison error was harmless beyond a reasonable doubt.

**IV. SENTENCING**

The defendant complains that the trial court improperly applied enhancement factor (7), the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement. See T.C.A. § 40-35-114(7). He argues that there is not sufficient evidence in the record to support the application of the factor. The defendant also contends that he should have received a sentence of less than twenty years for his rape of a child conviction.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As

the Sentencing Commission Comments to this section notes, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103 and -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

No witnesses testified at the sentencing hearing. A presentence report was introduced into evidence. The report reflects that the then thirty-six-year-old defendant had no prior felony convictions, although he had convictions for misdemeanor assault and driving under the influence of an intoxicant. It shows that the defendant dropped out of high school in the ninth grade. The report states that the defendant began using alcohol and marijuana when he was twenty years old, using them daily in large amounts until he turned thirty-five. The defendant also reported his addiction to pain pills. The presentence report reflects that the defendant worked as a machine operator for approximately five months and worked off and on for eleven years as a mechanic.

At the conclusion of the sentencing hearing, the trial court sentenced the defendant as a Range I, standard offender to concurrent sentences of twenty years and five years for his rape of a child and incest convictions, respectively. In sentencing the defendant, the trial court applied the following enhancement factors pursuant to T.C.A. § 40-35-114:

> (7) The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement; and

> (15) The defendant abused a position of private trust.

In applying factor (7), the trial court did not detail the facts upon which its application was based. The trial court determined that no mitigating factors applied.

Under the circumstances of this case, the trial court appropriately considered factor (7). In the defendant's statement, he prefaced his account with the statement that his wife "had been turning [him] away because she had some cysts." Although he denied that he was sexually attracted to the victim, the defendant described his actions at the Cape Norris residence as being "a want to touch thing." The defendant told Lieutenant Evans that after rubbing the victim's legs and between her legs for approximately fifteen to twenty minutes, the defendant went into his

23

bedroom and masturbated. The fact that the defendant continued to stimulate himself sexually after committing the crime suggests that the defendant was motivated to commit the offenses to gratify his desire for pleasure or excitement. We conclude that the evidence supports the application of factor (7) by a preponderance of the evidence. Under the circumstances of this case, a sentence of twenty years for the rape of a child conviction is warranted.

In consideration of the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
Joseph M. Tipton, Judge

CONCUR:


_____
Paul G. Summers, Judge


_____
Charles Lee, Special Judge