IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 17, 2008

## STATE OF TENNESSEE v. DERRANN WILLIAM ESTILL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-A-25     J. Randall Wyatt, Jr., Judge**

---

**No. M2007-02782-CCA-R3-CD - Filed July 7, 2009**

---

A Davidson County Criminal Court jury convicted the appellant, Derrann William Estill, of aggravated kidnapping, and the appellant pled guilty to domestic assault. After a sentencing hearing, the trial court sentenced him to concurrent sentences of seventeen years and eleven months, twenty-nine days, respectively. On appeal, the appellant contends that (1) the trial court erred by failing to define "possession" adequately when the jury requested a definition during deliberations, (2) the evidence is insufficient to support the conviction for aggravated kidnapping, and (3) his sentence for aggravated kidnapping is excessive. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Jeffery A. DeVasher (on appeal), Tyler Chance Yarbro (at trial), and Jonathan F. Wing (at trial), Nashville, Tennessee, for the appellant, Derrann William Estill.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Lisa Naylor, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Facts

The appellant was charged with especially aggravated kidnapping and domestic assault against his wife, Robin Rogers. Just prior to opening statements at trial, the appellant pled guilty to domestic assault. He proceeded to trial on the remaining charge.

Lieutenant Andrea Swisher testified that in August 2006, she was a sergeant with the Metropolitan Nashville Police Department and was assigned to the Domestic Violence Division. Shortly after 6:00 p.m. on August 26, Lieutenant Swisher was on patrol and received "a serious call for service." She went to the scene of the reported incident but did not see anything. Another officer arrived and reported that he also had not seen anything suspicious. Lieutenant Swisher received an incident update over her police radio and was directed to another location. The suspect vehicle, a pickup truck, was supposedly "headed outbound on Murfreesboro Road." Lieutenant Swisher drove in that direction and began looking for the truck. She learned the truck had turned onto the Trevecca University campus, so she turned into an entrance gate that was usually closed. She noticed the gate was open, looked onto a side street, and saw the pickup truck. She got out of her patrol car, drew her weapon, and ordered the truck's driver, who was the appellant, onto the ground. Lieutenant Swisher held him at gunpoint until another officer arrived.

Lieutenant Swisher testified that she heard the victim crying hysterically inside the truck. She approached the vehicle and saw the victim lying on her back on the passenger side. The victim's hands were tied together, and her hands were tied to her feet. The victim could not move and said, "[P]lease help me, please help me." Lieutenant Swisher crawled into the truck and tried to untie the electrical cord that was binding the victim. However, the cord was too tight, so Lieutenant Swisher borrowed a knife from another officer and cut the cord off the victim. She noticed that the truck's back window was in the bed of the truck.

Lieutenant Swisher testified that after she helped the victim out of the truck, she saw an open knife on the passenger seat. The victim had been lying on the knife, and Lieutenant Swisher asked the victim if she was injured. The victim "started pointing out . . . areas that were . . . hurt," and Lieutenant Swisher took photographs. The victim said that the appellant had hit her on the top of her head with his fist and that her head was hurting. Lieutenant Swisher looked for a bump on the victim's head and saw blood in the victim's hair. The victim lifted her shirt, and Lieutenant Swisher saw a bite mark on the victim's back. The victim also had ligature marks on her arms and legs. Lieutenant Swisher said the appellant acted arrogant in that he did not believe he had done anything wrong. During the appellant's booking process, Lieutenant Swisher told him that he was going to be charged with kidnapping, and the appellant responded, "[S]he's the one that kidnapped me."

On cross-examination, Lieutenant Swisher testified that she never saw a knife in the appellant's hands, never saw anything fall from his person, and never saw him throw anything. The victim did not claim she had been cut or stabbed, and Lieutenant Swisher did not see those types of injuries. Lieutenant Swisher informed the victim about obtaining an order of protection against the appellant, but the victim did not want one. The victim also did not want to go to a hospital, so a detective drove her home. Lieutenant Swisher acknowledged that none of her reports mentioned that the appellant was arrogant or that he claimed the victim kidnapped him. She also acknowledged that the victim told her the appellant only used the knife to remove the truck's rear window. Lieutenant Swisher did not check the appellant for injuries.

On redirect examination, Lieutenant Swisher testified that she did not recall smelling alcohol on the victim or the victim having slurred speech. The victim had been crying, and her face was red from the tears. Lieutenant Swisher did not know if she would have noticed the victim was intoxicated. The victim appeared to understand Lieutenant Swisher's questions, gave a detailed account of the incident, and said she had been married to the appellant for one or two months.

The victim testified that she had known the appellant for only a couple of months before they married on July 10, 2006. On August 26, 2006, the victim and the appellant lived together in Nashville. She said that the incident in question began about 4:00 a.m. and that the appellant's personality "would change about that time every day." The appellant began arguing with the victim and threatening her. Suddenly, the appellant gave the victim the keys to the pickup truck and said, "[W]ell, let's go." The victim got into the truck and locked all the doors. She said she was trying to get away from the appellant because she "didn't want to go through it again." As the victim was backing the truck out of the driveway, the appellant jumped into the bed of the truck. The victim began driving "a little wild," trying to get the appellant out of the truck. The victim stopped the truck and told the appellant to get out, but he refused. The victim was scared and continued driving. The appellant "popped out" the truck's back window and bit the victim on her back, leaving a scar. He also hit the victim on the top of her head with his fist several times.

The victim testified that the appellant climbed into the truck, pulled her out of the driver's seat, and put her onto the passenger seat. The victim said that "the next thing I knew I was hogtied." She could only turn her head and "thought that was going to be the end of it." She then heard a police officer say, "[S]top, get out of the truck with your hands up." The appellant got out, and the victim said, "Help me." The victim was crying and devastated, and Lieutenant Swisher took photographs of the victim while she was tied. When the officer untied the victim, the victim discovered that the knife had been "up under me." She said she did not remember seeing the appellant with the knife and that she could not remember "if I seen him with the knife trying to pop the window out." She said she was not worried about the knife because she was "more worried about him." When asked if the appellant possessed the knife prior to entering the truck, the victim said, "I think he had it on him, because he carried it a lot." Lieutenant Swisher took photographs of the victim's injuries, including the bite mark on her back, and told her about obtaining an order of protection. However, the victim was not interested in obtaining an order. She acknowledged that she was convicted of aggravated assault in 1998.

On cross-examination, the victim testified that she thought she saw the knife when the appellant opened the rear window but that she was not sure. The appellant did not cut the victim, did not waive the knife in her face, and did not threaten her with the weapon. The victim did not know how the knife ended up underneath her on the passenger seat. She said that the incident may have started at 4:00 p.m., not 4:00 a.m., and that she and the appellant were arguing about being out of crack cocaine and not having money to buy more. They had been using drugs throughout the day, and the victim also had been drinking beer. The victim acknowledged that drug use could make a person emotional and disoriented.

The victim testified that about three weeks prior to this incident, she was admitted to Baptist Hospital because the appellant tried to suffocate her by putting his hands over her mouth. She denied that she was admitted to the hospital for a drug overdose and said that the appellant told the hospital staff she tried to kill herself by taking a drug overdose. However, she acknowledged that drugs were in her system and stated that if a doctor said she overdosed, then "that's what it is, I guess." She denied being on drugs at trial or being under psychiatric care. She said she did not obtain an order of protection against the appellant, that she did not want to hurt him, and that she "just wanted to go home and get away from him."

On redirect examination, the victim testified that she was not "high" on drugs when the appellant kidnapped her and that she did not feel intoxicated. Initially, the victim claimed she spent six or seven days in Baptist Hospital during the prior incident, but she later acknowledged that she may have spent only three days in the hospital.

## II. Analysis

### A. "Possession" Instruction

The appellant contends that the trial court erred by failing to define "possession" adequately when the jury requested a definition during deliberations. He contends that the trial court should have instructed the jury only on the definition of actual possession as he had requested. The State argues that the appellant failed to show the trial court's instruction misled the jury. We conclude that the appellant is not entitled to relief.

The appellant originally was charged with especially aggravated kidnapping. As charged in the indictment, especially aggravated kidnapping is defined as false imprisonment "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-305(a)(1) (2006). In the jury charge, the trial court instructed the jury on especially aggravated kidnapping and its lesser included offenses, including aggravated kidnapping. Regarding the aggravated kidnapping instruction, the trial court followed Tennessee Pattern Jury Instruction 8.02 and stated as follows:

> For you to find a defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> 1) that a defendant removed or confined another unlawfully so as to interfere substantially with the other's liberty; and
>
> 2) that a defendant possessed or threatened the use of a deadly weapon.

-4-

See Tennessee Pattern Jury Instruction 8.02--Criminal (11th ed. 2007); see also Tenn. Code Ann. § 39-13-304(a)(5).

During deliberations, the trial court received a note from the jury, requesting a definition for "possession." The trial court informed the parties that it intended to instruct the jury on actual and constructive possession. However, the defense requested that the court instruct the jury only on actual possession, stating that "our position would be, Your Honor, that [the knife] has to be in his physical control at the time he committed the false imprisonment." Initially, the State agreed with the trial court that the court should instruct the jury on actual and constructive possession. However, the State later suggested that the trial court "let the Jury figure out what the meaning of possession is" and instruct the jury to "use your common sense." The trial court asked the appellant whether he preferred the common sense instruction or an instruction on both actual and constructive possession. The appellant reiterated that he preferred an instruction only on actual possession. When asked to choose between the common sense instruction or an instruction on both actual and constructive possession, the appellant stated that he preferred the common sense instruction. The trial court then instructed the jury as follows:

> Okay. I got your little question and maybe have the definition of possession. I'm afraid I may not give you a perfect answer to that at all. But I'm going to ask you to just use your common sense and understanding of what possession means. The Jury instructions that you have are adequate pattern instructions that we use on this particular kind of charge. . . . But I'm going to ask you, if you would, please, to read the instructions that you have and using your common sense, just interpret what our instructions are that the pattern that we use on this particular kind of charge and apply . . . your common sense to that.

The appellant contends that the trial court should have instructed the jury on actual possession.

"It is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986). In other words, "a defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Generally, the trial court must instruct the jury on the rules of law applicable to the issues that are fairly raised by the evidence adduced at trial. State v. Townes, 56 S.W.3d 30, 36 (Tenn. Crim. App. 2000), overruled on other grounds by State v. Terry, 118 S.W.3d 355 (Tenn. 2003). In determining whether jury instructions are erroneous, this court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998). "The proper function of a special instruction is to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001).

Initially, we note that although the pattern instruction for aggravated kidnapping defines terms such as "unlawful" and "deadly weapon," it does not define "possession." See Tennessee Pattern Jury Instruction 8.02--Criminal (11th ed. 2007); see also State v. Edmondson, 231 S.W.3d 925, 928 (Tenn. 2007) (noting that "possession" is not defined in our criminal code). Nevertheless, this court has often noted that for crimes involving the possession of a deadly weapon, the possession can be either actual or constructive. See State v. Moore, 703 S.W.2d 183, 186 (Tenn. Crim. App. 1985) (aggravated rape); State v. Keith Latrell Jackson, No. M2004-00562-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 339, at *30 (Nashville, Apr. 12, 2005) (possession of a firearm during the commission of or escape from an offense); State v. Larry Arnell Adams, No. E2002-03046-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 580, *67 (Knoxville, June 30, 2004) (aggravated spousal rape); State v. Ronald Killebrew, No. W2003-02008-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 472, *6 (Jackson, May 26, 2004) (felon in possession of a handgun). To establish constructive possession, it must be shown that the person accused had the power and intention at a given time to exercise dominion and control over the object directly or through others. See State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987).

Although the appellant contends that the trial court should have instructed the jury on actual possession only, that would have been an incorrect statement of the law. Therefore, the trial court did not err by refusing to instruct the jury as the appellant had requested. However, the trial court should have instructed the jury on actual and constructive possession. In any event, we conclude that the trial court's failure to define possession for the jury was harmless. The jury obviously considered the evidence and the trial court's instructions carefully, rejecting the State's theory that the appellant used the knife to kidnap the victim and concluding that the appellant only possessed the weapon during the kidnapping. We believe the jury would have reached the same result even if the trial court had instructed the jury on actual and constructive possession. Furthermore, as we will discuss in the next section, the evidence is sufficient to support aggravated kidnapping under a theory of either actual or constructive possession. Therefore, we conclude that the trial court's failure to define "possession" was harmless error.

## B. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his aggravated kidnapping conviction because the proof at trial failed to show that he actually or constructively possessed the knife. In support of his argument, he notes that the victim testified that she did not see the appellant with the knife, that the appellant did not use the knife to threaten her, and that she did not see the knife until the police found it on the passenger seat. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all

reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Aggravated kidnapping, as it would apply to the facts of this case, is defined as false imprisonment committed while the defendant possesses a deadly weapon or threatens the use of a deadly weapon. Tenn. Code Ann. § 39-13-304(a)(5). As stated previously, possession can be either actual or constructive. As stated previously, to establish constructive possession, it must be shown that the person accused had the power and intention at a given time to exercise dominion and control over the object directly or through others. See Cooper, 736 S.W.2d at 129. "In other words, 'constructive possession is the ability to reduce an object to actual possession.'" Id. (quoting State v. Williams, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)).

The victim testified on direct examination that although she did not remember if the appellant used the knife to take out the truck's back window, she thought the knife was on his person because he often carried it. Upon questioning by the defense, the victim also testified that she thought she saw the appellant with the knife when he opened the rear window. Furthermore, Lieutenant Swisher acknowledged on cross-examination that the victim told her the appellant used the weapon to remove the window. Based on this testimony, the evidence supports a conclusion that the appellant actually possessed the knife when he kidnapped the victim. The jury was not required to find that the appellant used or threatened the victim with the knife in order to find him guilty. See Tenn. Code Ann. § 39-13-304, Sentencing Commission Comments.

The evidence also established that after the appellant was arrested, Lieutenant Swisher found the appellant's open knife underneath the victim on the passenger seat. Therefore, even if the jury did not believe the appellant actually possessed the knife, the jury could have concluded that he constructively possessed it because he had the ready ability to actually possess it. The evidence is more than sufficient to support the appellant's conviction for aggravated kidnapping.

## C. Sentencing

The appellant contends that his sentence is excessive because the trial court misapplied an enhancement factor. We disagree.

At the appellant's sentencing hearing, Steven Anthony Montgomery, an assistant professor of psychiatry at Vanderbilt University, testified that he interviewed the appellant for about three hours on June 9, 2007. The appellant reported that his father was abusive and left the family when

the appellant was about three years old. The appellant rarely saw his father and was forced to start working when he was about six years old in order to support the family. Many of the appellant's paternal relatives were addicted to cocaine, and a maternal uncle was dependent on alcohol. Three of the appellant's sisters had been prescribed anti-depressant medications.

Dr. Montgomery testified that the appellant was in a car accident in February 1989 and that "the majority of the right side of his face was essentially ripped off." In a subsequent serious car accident, the appellant received a gash to his head and lost consciousness. In addition to the head injuries from the car accidents, the appellant received head injuries from boxing and fighting. An I.Q. test revealed the appellant had an I.Q. of 80, the low end of the normal range, and an MRI showed the front part of his brain was smaller than normal. Dr. Montgomery stated that the front part of the brain was involved with curbing impulses and that he diagnosed the appellant with Impulse Control Disorder. The appellant also suffered from hypothyroidism, high blood pressure, a viral type of hepatitis, degenerative disc disease in his back, and headaches. Dr. Montgomery said he thought psychiatric medications would help the appellant control his impulsiveness.

Dr. Montgomery testified that the appellant joined the United States Navy when he was seventeen years old and was deployed to combat areas of Vietnam. The appellant served as a "hole technician," and one of his duties allegedly was "to help fish dead bodies out of the ocean." The appellant began drinking heavily as a teenager and became addicted to alcohol. He began using cocaine in the mid-1980's and also used various other illegal drugs. Dr. Montgomery stated that the appellant exhibited signs of willingness to cooperate and participate in treatment for his substance abuse.

On cross-examination, Dr. Montgomery acknowledged that the appellant exhibited violent behaviors prior to his 1989 car accident. He explained that many genetic and environmental factors could cause a person to develop violent behaviors.

The appellant's presentence report was introduced into evidence. According to the report, the then fifty-three-year-old appellant was disabled and received Social Security disability income. The report shows that the appellant served five years in the United States Navy and was honorably discharged in 1975. In the report, the appellant stated that he began using marijuana in 1975 and cocaine in 1984 but that he had not used cocaine since 1985 or 1986. He stated that his 1989 car accident resulted in his being blind in one eye, and he described his physical health as "fair." He stated in the report that he was declared disabled in 1987 due to "shell shock" from his service in Vietnam and his 1989 car accident. According to the report, the appellant completed substance abuse treatment programs in 1988 and 2006 and completed an anger management program while he was incarcerated in 2006. The report shows that the appellant had convictions for various offenses since 1978, including convictions for armed robbery, possession of a firearm with intent to go armed, driving on a suspended license, driving on a revoked license, possession of a gambling device, misdemeanor theft, disorderly conduct, driving under the influence, and misdemeanor possession of a controlled substance.

The trial court ruled that the appellant was a Range II, multiple offender and noted that his range of punishment for the aggravated kidnapping conviction, a Class B felony, was twelve to twenty years. The trial court applied enhancement factor (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and factor (5), that the appellant "treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense." Tenn. Code Ann. § 40-35-114(1), (5) (2006). In mitigation, the trial court noted that the appellant had been honorably discharged from the Navy and suffered from physical and mental problems. See Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the appellant to seventeen years in confinement for the aggravated kidnapping conviction and ordered that he serve a concurrent eleven-month, twenty-nine-day sentence for the domestic assault conviction.

Appellate review of the length, range or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement by the appellant in his own behalf. See Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

The appellant contends that his sentence is excessive because the trial court misapplied enhancement factor (5), that he treated the victim with exceptional cruelty. He argues that the facts do not show he tortured the victim or treated her in a manner that justifies application of the factor.

Enhancement factor (5) regarding exceptional cruelty is generally applied to cases involving abuse or torture. State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995). Before a trial court may apply enhancement factor (5), the facts of the case must support a "finding of cruelty under the statute 'over and above' what is required to sustain a conviction for [the] offense." State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001).

The trial court applied enhancement factor (5) based on the fact that the appellant hog-tied the victim, leaving ligature marks on her arms and legs, and based on the "terror and the trauma that she was put through in this ordeal." Although a close question, we conclude that the trial court properly applied the enhancement factor. In our view, the appellant's biting the victim on her back, hog-tying her, and hitting her on the top of her head repeatedly with his fist goes over and above

what was required for aggravated kidnapping. In any event, the appellant's extensive criminal history justifies his seventeen-year sentence. Therefore, he is not entitled to relief.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____

NORMA McGEE OGLE, JUDGE