IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 5, 2017

**STATE OF TENNESSEE v. TAVIS BOWERS**

**Appeal from the Circuit Court for Madison County**
**No. 11-152     Roy B. Morgan, Jr., Judge**

_____

**No. W2016-01007-CCA-R3-CD**

_____

The defendant, Tavis Bowers, was convicted by a Madison County jury of two counts of assault by offensive or provocative touching, a Class B misdemeanor, and one count of resisting arrest, also a Class B misdemeanor.  He was sentenced by the trial court to concurrent six-month sentences for the assault convictions, to be served consecutively to a six-month sentence for the resisting arrest conviction.  On appeal, he challenges the sufficiency of the convicting evidence and argues that the trial court committed plain error by not instructing the jury on self-defense.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender; Jeremy B. Epperson, Assistant Public Defender (on appeal); and David W. Camp, Jackson, Tennessee (at trial), for the appellant, Tavis Bowers.

Herbert H. Slatery III, Attorney General and Reporter; Leslie E. Price, Senior Counsel; James G. (Jerry) Woodall, District Attorney General; and Rolf G. S. Hazlehurst, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

According to the State's proof at trial, in the very early morning hours of January 14, 2011, uniformed officers from the Jackson Police Department responded to a

disturbance call at the home of Vanessa Robertson, the defendant's girlfriend, who informed the officers that the defendant was inside intoxicated and refused to leave her home. The officers entered the home, announced themselves, and located the defendant lying on a bed in a back bedroom. They identified themselves to him as police officers and asked him to get up to talk to them. When the defendant failed to respond, one of the officers took hold of his arm to shake it. The defendant pulled his arm away and swung his other arm at one of the officers, striking him in the torso. A struggle ensued, during which the defendant shoved another officer into a dresser as all three officers wrestled to restrain him and place him under arrest.

Two of the three responding police officers testified against the defendant at his August 2011 trial. Officer Michael Byrd testified that an upset Ms. Robertson, who met the officers outside her residence, informed them that the defendant, a visitor to her home, "was inside highly intoxicated and refused to leave." He said he, Officer Valdes, and Officer Washburn entered the home announcing "Jackson Police Department" and walked down a hallway to a back bedroom, where they found the defendant lying at the foot of a bed. He testified that both he and Officer Valdes told the defendant to get up because they needed to talk to him, but the defendant did not respond. He recalled that he identified himself as a police officer before asking the defendant to get up.

Officer Byrd testified that when the defendant failed to respond to their second request for him to get up, Officer Valdes reached down, grabbed his left arm, and started to shake it. The defendant "yanked" his arm away and "reached up and hit [Officer Byrd] in [his] left torso" with his right hand. Officer Byrd said he was stunned and stepped back, only to have the defendant "come up off the bed at [him]." He stated that Officer Washburn came across the room to his defense and that Officer Washburn and the defendant "locked up" before the defendant threw Officer Washburn against a dresser. The defendant started toward Officer Washburn, who had ended up on the floor, and Officer Byrd responded by jumping on the defendant's back. The struggle continued with all three officers and the defendant "slung to the bed," where Officer Byrd was eventually able to handcuff the defendant.

Officer Byrd testified that as he was trying to handcuff the defendant, he and his fellow uniformed officers identified themselves as police officers and repeatedly instructed the defendant that he was under arrest and to put his hands behind his back. Officer Byrd said he was aware of Officer Washburn's having used his chemical spray on the defendant during the struggle. In addition, he recalled that Officer Valdes "stated afterwards he had to use his Ast baton." He testified that after the defendant was taken into custody, he was transported to the emergency room of Jackson-Madison County General Hospital.

The defendant's hospital medical records, which reflected that he was treated for three lacerations to the head, were admitted by stipulation. On cross-examination, Officer Byrd testified that he did not smell any alcohol on the defendant, but he did not get "close enough to his breath." He said he recalled having said "Jackson Police Department two times" -- once as he was walking down the hall and again in the bedroom. He stated that he and his fellow officers initially were interested only in getting the defendant's side of the story in the domestic dispute; they had no intent to arrest him until after he struck Officer Byrd. He was not aware of Officer Valdes' use of his baton until later, but he was aware of Officer Washburn's use of mace, or "Freeze Plus," during the struggle. Officer Byrd denied ever striking the defendant with his flashlight.

Officer Daniel Washburn's testimony essentially corroborated that of Officer Byrd, with the added details that Ms. Robertson warned the officers to "be careful, he is going to fight you" and that the defendant flung him first into a dresser, where he struck his hand, before tossing him into the corner of the room. He also testified that Officer Valdes "deployed his Ast baton trying to strike [the defendant's] arms" as the defendant resisted their efforts to handcuff him. He stated that "[n]othing seemed to be working" until he deployed his chemical agent to the defendant's face. He believed that Officer Valdes used his chemical agent on the defendant as well.

Officer Washburn further testified that he repeatedly told the defendant to "[s]top resisting arrest." He said that he was treated at the emergency room for a sprained wrist, which caused him to miss two or three days of work. On cross-examination, he denied that Officer Byrd struck the defendant with a flashlight or that the officers were angry at the defendant for not responding to their requests to get up to talk to them. He testified that they initially had no intention to arrest the defendant, but after he struck Officer Byrd, "there was no question he was under arrest at that time."

Officer Brad York of the Jackson Police Department testified that he responded to the Jackson-Madison County General Hospital Emergency Room at approximately 2:25 a.m. on January 14, 2011 "to . . . guard [the defendant]." He said that as he was standing in the doorway of the treatment room, the defendant volunteered to himself and to Officer Allen that "he heard what the officers were telling him" and "just disregarded the commands and stuff due to the way the officers were talking to him." On cross-examination, Officer York acknowledged that the defendant also stated that the officers jumped on him when he ignored their commands.

Officer Joe Allen of the Jackson Police Department testified that as he was guarding the defendant at the hospital, the defendant stated that "the officers had jumped on him." He said the defendant told him that he had been lying in bed and had heard the officers but did not respond because he did not like what they were saying to him.

The defendant's self-described "off and on" girlfriend, Vanessa Robertson, called as a witness for the defense, testified that she followed the three officers into the house and down the hall and heard them call the defendant by name and ask him to get up. She said that the defendant answered, "[F]or what?" and Officer Byrd then struck him on his leg with a flashlight. At that point, she turned and walked away from the bedroom. On cross-examination, she testified that her current relationship status with the defendant was "on." She denied that she told the responding police officers that the defendant was intoxicated, testifying that she instead said that he might be drunk. She also denied warning the officers that the defendant would fight them. Finally, she testified that the officers never announced themselves to the defendant as police officers.

The defendant, who said he was living with Ms. Robertson at the time of the incident, testified that the two had "bicker[ed]" over something minor and Ms. Robertson, who had "a bad tendency of quickly getting upset about . . . any little thing[,]" told him that she had called the police. He said he was in the kitchen when the officers arrived but turned and went to lie down on the bed in the back bedroom. According to his testimony, the officers never announced themselves. Instead, Officer Valdes came into the room and struck him on the leg without warning. The defendant testified he asked the officer what the problem was, but instead of answering, one of the officers sprayed him with freeze spray, which burned his eyes and choked him. Because he could not breathe, he jumped up off the bed to get away from that area. He next remembered being kicked in the face and struck in the head and the officers' ordering him to get down.

The defendant denied that he ever struck an officer or that he did anything wrong, other than "trying to beg to see and breathe." He said the officers sprayed him once or twice more in the bedroom and again after he was handcuffed and sitting in the back of the squad car. In his opinion, the officers came into the house with "a bit of an attitude." The defendant testified that he had been drinking earlier in the evening but denied that he was drunk when the officers arrived.

On cross-examination, the defendant reiterated that he was attacked by the officers without warning or provocation and denied that he knew the officers were trying to place him under arrest.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the evidence at trial was insufficient to sustain his convictions. In support, he cites his medical records of his "numerous head injuries" to argue that the testimony of the officers was inconsistent with the physical proof at trial. He also argues that the proof showed that the officers lacked "just cause to enter the residence to conduct an interview." The State responds by arguing that the evidence, viewed in the light most favorable to the State, established that the defendant assaulted Officer Byrd by punching him, assaulted Officer Washburn by throwing him against a dresser, and resisted arrest by continuing to fight after the officers told him he was under arrest. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted

defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

This is a classic case involving credibility determinations by the jury. The officers' testimony describing the incident was more than sufficient to establish the elements of assault and resisting arrest. See Tenn. Code Ann. §§ 39-13-101(a)(3), 39-16-602(a). By its verdicts, the jury obviously accredited the testimony of the officers over that of the defendant and Ms. Robertson, as was its right. We, therefore, conclude that the evidence is sufficient to sustain the defendant's convictions.

## II. Omitted Jury Instruction on Self-Defense

The defendant also contends that the trial court committed plain error by not sua sponte instructing the jury on self-defense, which, the defendant argues, was fairly raised by the evidence. The State argues that the defendant cannot establish that the trial court committed plain error by not giving the instruction. We, again, agree with the State.

Because the defendant failed to request a jury instruction on self-defense, he is limited to plain error review. The doctrine of plain error provides that where necessary to do substantial justice, an appellate court may take notice of a "plain error" not raised at trial if it affected a substantial right of the defendant. Tenn. R. Crim. P. 36(b). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

We agree with the State that the defendant cannot show plain error in the trial court's not issuing an instruction on self-defense. "It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Farner, 66 S.W.3d 188, 204 (Tenn. 2001) (citing State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). The trial court has no duty, however, to instruct the jury on self-defense when the proof does not fairly raise that defense. In

deciding whether a defense instruction is warranted, the trial court "must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." State v. Sims, 45 S.W.3d 1, 9 (Tenn. 2001).

We agree with the State that the proof did not support a self-defense instruction. Our self-defense statute provides in pertinent part that:

> a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of *unlawful* force.

Tenn. Code Ann. § 39-11-611(b)(1) (emphasis added). Moreover, the statute expressly provides that the presumption that a person using force intended or likely to cause death or serious injury within a residence was operating under a reasonable belief of imminent death or serious bodily injury does not apply when the "person against whom force is used is a law enforcement officer . . . who enters . . . in the performance of the officer's official duties" and the defendant "knew or reasonably should have known that the person . . . was a law enforcement officer." Id. § 39-11-611(d)(4).

Regardless of whether or not the officers announced themselves, the defendant, by his own admission, knew that they were police officers who had responded to his girlfriend's call. Thus, the evidence did not fairly raise the defense of self-defense. The defendant is not, therefore, entitled to plain error relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE